## McCORMICK *v.* HAWKINS.

1. LIBEL AND SLANDER—PUBLICATION—DAMAGES.

    An article published in a newspaper charging a superintendent of schools with gross incompetency, with trickery and dishonesty, was, if false and malicious, slanderous *per se,* relieving plaintiff of the necessity of proving special damages.

2. SAME—TRIAL.

    The court, in an action for libel, properly refused to receive a verdict offered by the jury for $1,500 and requiring defend-

ant to retract the libel; and it was proper to state to the jury the applicable rules of law and to receive their final verdict of $3,000.

3. SAME.

Considering the fact that a retraction would have benefited plaintiff in his profession, the increase in damages was not in itself erroneous.

4. SAME—DAMAGES—APPEAL AND ERROR—JURY—STATUTES.

In the absence of a request to instruct the jury to separate damages for injury to plaintiff's feelings from other damages assessed, defendant could not review the point on error.

5. SAME—DAMAGES—EXCESSIVE VERDICT.

Without proof that plaintiff suffered in his business or profession from the libel, a verdict of $3,000 was too much, and is reduced, on review of defendant's motion for a new trial, to $1,500.

Error to Antrim; Mayne, J. Submitted November 23, 1911. (Docket No. 172.) Decided May 3, 1912.

Case by Peter F. McCormick against Oren E. Hawkins for libel. Judgment for plaintiff. Defendant brings error. Modified and affirmed.

*Clark E. Densmore* and *Smith, Baldwin & Alexander*, for appellant.

*Fitch R. Williams* and *Elisha N. Clink*, for appellee.

This is an action of libel. Defendant, who is the owner of a newspaper which he conducts at the village of Mancelona, in this State, on January 23, 1910, published the following paid advertisement:

"SPEAKS FOR ITSELF.

"MUSKEGON, MICH., Jan. 23rd, '10.

"Two years ago I took the work of serving supper to the business men's banquet in Medalie hall at Mancelona for $22. Up to this time I have received $6 on this amount and have never been able to find out who I was to collect balance of $16 from. P. F. McCormick gave me the contract.

"GEO. L. PETRIE."

On February 3, 1910, there was published in the Mancelona News, a rival paper, the following:

"It Speaks for Itself.

"The News has taken some pains to make an investigation of what the facts are in relation to the alleged letter recently published and entitled: 'Speaks for Itself.' As a public official, the party reflected upon, personally says that he does not care to be dragged into any controversy, and states that he believes that his daily life and work among our people will vouch for his integrity and worth and is too well founded to be shaken by any venom which a personal enemy of himself can throw at him.

"The News, however, believes that the public and our business men who are also reflected on by the article, should have the benefit of knowing that the matter is not based on any true statement of facts. And as the News stands for the upbuilding and advancement of Mancelona and against this kind of knocking and the attempt to reflect upon and injure our little village or any of its citizens or institutions, we recognize the matter just far enough to advise that any person who may take or be inclined to take any stock in the reflection made in the article named, should investigate the facts himself and then give censure or credit to the party where it belongs."

Defendant thereupon, and on February 10, 1910, published in his paper, the Mancelona Herald, the following article, which is alone counted upon in plaintiff's declaration:

"A Few Facts in The Case.

"It appears that the paid ad. in the Herald of Geo. L. Petrie has stirred up considerable excitement in the camp of the ring. There would never have been any cause for such publication if Petrie had been honestly paid for his services, and as the ad. was a perfectly legitimate publication the blame of the affair rests upon the parties who neglected to settle an honest account. Now as to the facts of the case as told by E. L. J. Mills to The Herald. He says that just prior to Dr. Wyman's lecture given here two years ago that E. J. O'Brien a student in the Detroit Medical College where Wyman was a professor, wrote to him that he (O'Brien) would consider it as a personal favor if Mills would arrange for a complimentary

reception in honor of Mr. Wyman. Mills says that being very busy he asked P. F. McCormick to take charge of the affair, that the latter consented and that he (McCormick) did arrange with Petrie for the feed and took full charge of the affair. Mills also says that as 60 or more people attended the banquet, that each one was charged 50 cents, there was surely plenty of money to settle all bills and that he supposed everything had been satisfactorily settled until he read the ad. in the paper. We might add that P. Medalie gave the free use of his hall for the reception, hence there was no expense in that direction.

"This article would never have been published if an entirely untruthful statement of the publication of the ad. had not appeared in the 'Spite or Knocker' sheet of the town which is supposedly run by the hatchet faced shadow of the man with the shady reputation and backed by the rotten political ring that dominated affairs in this country for years until it was knocked out by primary reform.

"Now so far as McCormick is concerned, his career in the town has been a disgrace to the school that he is supposed to honor by standing at its head. He seemingly has no appreciation of the responsibility that goes with indebtedness incurred by him. He has had trouble with almost every business man in town with whom he has had dealings and several of them will not extend credit to him, as he almost invariably becomes angry when presented with a statement. He started a spite paper out of personal enmity to the editor of The Herald and it is reported on good authority said he would run us out of town and all simply because we forced him to pay what he honestly owed us. He got goods at this office under false statements and then swore like a trooper when called to this office and forced to settle. He gave a note to the Herald Editor for a press for the High School and then had to be threatened with suit and garnishment of salary to secure its payment. And finally he had to be sued before Justice Wallace to compel him to pay his subscription and a small ad. account.

"Last winter the school board heard rumors of his laxness in paying accounts and one member investigated and found about half a dozen business places where he owed, one merchant complaining that he was no better about paying than a former superintendent who was literally 'forced' out of the school. Another board member loaned

him the money to go around and settle his bills. This was shortly before the board re-elected him superintendent.

"He has a mean habit of slurring and 'roasting' students before a room full of children, and not many months ago after insulting a student during literary exercises before a crowd of visitors was publicly called down by one of the lady visitors whose very proper womanly dignity became aroused at such boorish conduct. He has had trouble with several of the teachers in the past and few besides his pets have little respect for him. He has been responsible for the loss to the school of several experienced and capable teachers, some of whom could more creditably and more worthily fill the position of superintendent. He has a mean habit of sneering at anything and everything unless he is at the head of it.

"The stuffing of book knowledge into children's heads is not the chief object of a school nor the real duty of a teacher, but instead the building of a character. What respect can children have for an instructor who is tricky and has to be forced to pay honest debts. Does not such an example have a tendency to cause the children to think dishonestly and dishonorable methods rather than the right? Remember that school children are building the character every day that is to guide their life, that is to lead them to higher and noble man and womanhood or just the reverse. Which way do you wish your boy or girl to go?

"We know it is not a nice thing to parade a town's troubles in cold print, and while we care nothing about his meanness and lies about the editor personally, but there is a limit to outraged feelings and that is when an unprincipled thing strikes at us by insulting our family and our children in school, that which any man holds dear, and if he has a particle of manhood about him will protect against the attacks of any dirty cur."

After the publication of the foregoing article, plaintiff demanded of the defendant the publication of a retraction which was refused. Under the plea of the general issue defendant gave notice of good faith and justification. Plaintiff having recovered a judgment in the sum of $3,000, defendant reviews his case in this court by writ of error. He makes and relies upon the following points:

"(1) The refusal to receive and accept the verdict for $1,500 and the failure to treat the rest of the verdict as surplusage.

"(2) The refusal of the court to grant defendant's motion for a new trial.

"(3) The failure of the court to require the jury to divide the damages.

"(4) The error of the court in receiving certain evidence.

"(5) The error of the court in excluding certain evidence.

"(6) The error of the court in refusing to instruct the jury as requested.

"(7) The error of the court in instructing the jury in the manner the jury was instructed."

BROOKE, J. (*after stating the facts*).    Before considering the errors assigned, it seems proper to consider the character of the article counted upon.    The plaintiff, at the time of its publication and for some years prior thereto, occupied the position of superintendent of schools in the village of Mancelona.    He held a place in his community not only of great importance, but also one which demanded of its incumbent that he be a man of high character, of unimpeachable integrity, and of correct conduct. .

The effect of the publication. we are here considering upon the reputation of a man holding such a position cannot in our opinion be questioned.    Even if it does not directly charge the commission of a crime, it does impute to plaintiff gross incompetency and unfitness for the position he held.    It was published of and concerning the plaintiff as superintendent of schools, and its tendency unquestionably was to bring plaintiff into hatred and contempt, to imperil the position he then held, and to prevent him from securing like employment elsewhere.    Under all the authorities, this publication, if false and malicious, was actionable *per se* and relieved the plaintiff from the necessity of proving special damages.    *Tryon* v. *Evening News Ass'n*, 39 Mich. 636; *Oliver* v. *Perkins*, 92

Mich. 304 (52 N. W. 609); *Smedley* v. *Soule,* 125 Mich. 192 (84 N. W. 63); 18 Am. & Eng. Enc. Law (2d Ed.), pp. 909, 942, 964, and cases cited; 25 Cyc. p. 336, and cases cited.

The first reason assigned for reversal involves a consideration of what occurred at the close of the trial. After the jury had been out for a time, they returned into court for further instructions. The foreman said:

"We want to find out if we could assess the defendant to a retraction of the article as published in Exhibit 1. Also, if we had authority—would have authority to assess a penalty aside from that."

The court thereupon proceeded to instruct the jury as to the law upon the subject of retraction. He pointed out to them that, inasmuch as the defendant had not published a retraction of the alleged libelous article, the question of malice was open for their consideration. He did not in terms answer the question of the foreman, and it is evident that the jury failed to understand his instruction, for after further deliberation they returned to court, and the following proceedings were had:

"*The Court:* Your foreman will arise. Gentlemen, have you agreed upon a verdict?

"*Foreman:* Yes, your honor.

"*The Court:* What is your verdict?

"*Foreman:* We have agreed upon the following verdict:

"Bellaire, Mich., Oct. 13, 1910.

"We, the jury, in the case of *Peter F. McCormick* v. *O. E. Hawkins,* agree on the following verdict: That O. E. Hawkins did publish an article in the Mancelona Herald against Mr. McCormick, with malicious intent. Further, that we, the jury, assess O. E. Hawkins to $1,500 damages to Peter F. McCormick. Also, that said O. E. Hawkins be caused to publish a retraction of said libelous article in the Mancelona Herald for three successive issues, and it be given some conspicuous place in each issue in said paper.

"*The Court:* Now that portion of the verdict referring to his publishing it would be beyond the power of this

court to enforce, and your verdict should be merely for damages—an amount of money. We could not make him do that. Under this form of action, all we can do is to assess the damages in money, and your verdict should be in this form: We find the defendant guilty, and assess the plaintiff's damages at the sum of blank dollars—whatever that is, whatever you agree upon. This would be outside of the verdict. You may return to your jury room.

"*Foreman:* Now, if we want to entirely vindicate this gentleman, Mr. McCormick, could we put that in the verdict in any way?

"*The Court:* No, all you can do is to put in dollars and cents. His vindication is dollars and cents.

"*Foreman:* It is a poor vindication.

"*The Court:* You may return. The requirements of the law are that it must be in dollars and cents only."

After being out for a time, the jury returned into the courtroom, when the following proceedings were had:

"*The Court:* Gentlemen of the jury, have you agreed upon a verdict?

"*Foreman:* We have.

"*The Court:* What is your verdict?

"*Foreman:* We, the jury, in the case of *Peter F. McCormick* v. *O. E. Hawkins,* agree on the following verdict: That O. E. Hawkins did publish an article in the Mancelona Herald against Mr. McCormick with malicious intent. Further, that we, the jury, assess O. E. Hawkins $3,000 damages to Peter F. McCormick."

Should the first verdict have been received by the court and a judgment entered thereon? We are of opinion that in declining to accept it, and in further directing the jury as he did, the learned trial judge acted properly. It is, we think, clear that the jury in rendering the first verdict believed that they had the power to compel defendant to publish a retraction and that such publication would be of great value to the plaintiff. That such retraction, had it been published, would have been valuable to the plaintiff, cannot be doubted. We cannot agree with counsel for defendant in their claim that the remarks of the court at this juncture were in effect such as to invite the jury to wreak

vengeance upon the defendant. On the contrary, the statements of the court seem to us to be fair and judicial and to indicate no bias on the part of the court.

We are cited by defendant to the following cases upon this point: *Burkle* v. *Ingham Circuit Judge*, 42 Mich. 513 (4 N. W. 192); *Rawson* v. *McElvaine*, 49 Mich. 194 (13 N. W. 513). Neither of these cases is authority for the position taken by counsel. The first was in a statutory proceeding in ejectment, and it was held that inapplicable special findings by the jury would not prevent the entry of judgment, for possession, in plaintiff's favor. In the second, that part of the verdict objected to by defendant was held to be surplusage, as it was no more than would follow from the verdict rendered and judgment thereon.

The case of *J. Richardson & Co.* v. *Noble*, 143 Mich. 546 (107 N. W. 274), is in point. It requires no citation of authorities to demonstrate that, when a jury returns to the courtroom and tenders an imperfect, irregular, or defective verdict, it is the duty of the court to further appropriately instruct them, and direct their retirement. Jurors are not learned in the law, and very frequently misapprehend the scope of their powers and duties. Such misapprehensions, when they find expression in improper verdicts, should at once be corrected by the trial judge, and, if possible, a proper verdict secured.

Nor are we prepared to say that, in doubling the money amount of the original verdict in lieu of the publication of a retraction, the jury acted unreasonably or vindictively. The wrong from which the plaintiff suffered, if the publication counted upon was false and malicious, was a continuing one, and the publication of a retraction would largely tend to prevent such injury in the future.

It is next urged that the court erred in refusing to grant defendant's motion for a new trial. Thirteen distinct reasons are assigned by defendant why a new trial should be granted. These were considered *seriatim* by the trial judge. One of those principally relied upon has already

been discussed. Such others as require attention will be noticed hereafter.

The third reason assigned for reversal is the failure of the court to instruct the jury to specify what sum is allowed for injury to feelings and what sum is allowed for other injuries. 3 Comp. Laws, § 10424, requires the damages to be so separated by the jury in any suit brought for the recovery of damages for libel or slander in this State. Defendant, however, made no request that the jury be so instructed, and in no way raised the point upon the trial. We have held that, under these circumstances, an assignment of error will not lie. *McGee* v. *Baumgartner*, 121 Mich. 287 (80 N. W. 21); *Mahiat* v. *Codde*, 106 Mich. 387 (64 N. W. 194), and cases cited.

Errors assigned upon the receiving and exclusion of evidence have been examined. They do not, in our opinion, require discussion.

Many assignments of error are based upon the refusal of the court to charge as requested and upon the charge as given. The charge, taken as a whole, is not open to criticism from the standpoint of the defendant. Many of defendant's exceptions to it lose their force when it is considered that the published article was libelous *per se*, and, if untrue, entitled plaintiff to damages for injury to his feelings and reputation without proof thereof; it being presumed in law that such damages would necessarily follow the publication.

Was the verdict excessive? We must consider the verdict of $3,000 as if it had been rendered without the incident which occurred in the rendering of the first illegal verdict. The verdict is undoubtedly a large one when the situation of the parties is considered. Ordinarily, the jury having found the publication to be false and malicious, their determination as to the amount of damages suffered by the plaintiff should control. This record, however, is somewhat peculiar in one respect. It seems to show that, so far from injuring plaintiff in his business or profession, the publication had no harmful effect upon

him in that respect. Indeed, it is not certain that it did not actually benefit him in the immediate neighborhood of his residence. While this fact may not be used to mitigate damages actually suffered by plaintiff, it may serve to help to a determination of what those damages were.

After a careful consideration of the whole matter, we have concluded that the judgment must be set aside, and a new trial ordered, unless plaintiff will remit the sum of $1,500, in which event it will stand affirmed.

Moore, C. J., and Steere, McAlvay, Blair, Stone, and Bird, JJ., concurred with Brooke, J.

Ostrander, J. I concur in reversing the judgment, but am not satisfied that the case is one in which this court should fix the amount of judgment. I think therefore that a new trial should be granted.