[No. 25489-8-I. Division One. August 26, 1991.]

MALARKEY ASPHALT COMPANY, *Appellant,* v. HARRY S.
WYBORNEY, ET AL, *Respondents,* MICHAEL O.
MALARKEY, ET AL, *Appellants.*

496

*Stephen M. Rummage* and *Davis Wright Tremaine,* for appellants.

*James E. Kennedy* and *Kennedy, Schuck, Harris, Miller & McCormmach,* for respondents.

KENNEDY, J. — Appellant Malarkey Asphalt Company, formerly MCW, Inc., initiated the action below against respondents Wyborney, alleging that Harry Wyborney, while an officer and director of MCW, had breached his fiduciary duty by approving expenditures of $47,187.44 in corporate funds that personally enriched Mr. Wyborney and his family members. The Wyborneys denied that any wrongful expenditures had been made and filed a counterclaim against Malarkey Asphalt Company alleging that its two principals, Michael Malarkey and Peter Chance, had conspired to wrongfully discharge the Wyborneys from their employment with MCW. The Wyborneys also

brought a third party complaint against appellants Michael Malarkey and Peter Chance and several others alleging that these third parties had tortiously interfered with the contractual relationship between Harry Wyborney and MCW, Inc.

After jury trial of the case a verdict was returned finding that Harry Wyborney had not breached his fiduciary obligations to MCW. The jury also found that the Wyborneys were entitled to damages in the sum of $10,000 for wrongful discharge of employment, and that the Wyborneys could recover on the tortious interference claim, but only against the appellants Michael Malarkey and Peter Chance. When asked on the special verdict form what the amount of the Wyborneys' damages was for the tortious interference, the jury responded: "an amount of money equivalent to all defendants' court costs, legal fees [and] attorney fees."

Appellants Malarkey Asphalt Company, Michael Malarkey and Peter Chance brought this appeal to challenge the monetary judgments rendered on the verdict of the jury. Malarkey Asphalt Company has not appealed the jury's verdict that Wyborney did not breach his fiduciary obligations to MCW, Inc. We affirm in part and reverse in part.

## ISSUES

Appellants Michael Malarkey and Peter Chance, hereinafter referred to as "Malarkey" and "Chance", respectively, claim that their motion for judgment n.o.v. should have been granted because there was no legal basis for an award of attorney fees on the claim of tortious interference with contract, and, that if there was a legal basis for this award, the trial court erred in determining the proper amount to be awarded. Appellant Malarkey Asphalt Company claims its motion for directed verdict and judgment n.o.v. should have been granted because there was no evidence that Marie Wyborney had been discharged from her employment or that Harry Wyborney had been wrongfully discharged. Malarkey Asphalt Com-

pany also claims that the trial court misinstructed the jury in the wrongful discharge action.

FACTS

MCW, Inc., was formed in 1978 by Messrs. Malarkey, Chance and Wyborney for the purpose of purchasing and operating an asphalt production facility then known as Duwamish Manufacturing. Duwamish Manufacturing was owned by the Santis family. At the time of the purchase, Malarkey was president of Malarkey Roofing Company, headquartered in Portland, Oregon. Chance was a salesman for both Duwamish Manufacturing and Malarkey Roofing Company. Wyborney was plant manager for Duwamish Manufacturing. Santis, Wyborney and Chance were also partners in a business known as Sea-Tac Supply, which was affiliated with Duwamish Manufacturing.

Malarkey put up most of the cash for the purchase of Duwamish Manufacturing, and thereby acquired a two-thirds interest in MCW, Inc. Chance put up $50,000 for a one-sixth interest. Wyborney put up $9,900 for a one-sixth interest, and also loaned MCW $31,758. Wyborney's principal contribution was to be his expertise. Wyborney was to assume the responsibility for the asphalt production and sales operations. Although Malarkey had sufficient funds to purchase the business without the participation of Chance and Wyborney, Malarkey did not wish to handle the daily operations of MCW, Inc., and Chance wished to continue in his sales activities, as previously had been the case. Wyborney had considerable experience and expertise, including some 20 years of direct experience in the marketing and production of asphalt.

Santis would not agree to sell the asphalt production facility to MCW unless Chance and Wyborney gave up their interests in Sea-Tac Supply, which they agreed to do. Chance and Wyborney received back their initial investments into Sea-Tac Supply, but no return on those investments.

MCW, Inc., operated the asphalt production and sales business from the time of its purchase in 1978 until November of 1983. During those years, Wyborney served

as plant manager and supervisor of sales. Malarkey continued to manage his other companies. Chance continued to work as a salesman for both MCW and Malarkey Roofing Company. Although the principals consulted about various management matters, Wyborney had primary responsibility for running the daily operations of MCW. Under Wyborney's management MCW gradually increased its gross sales from $1.5 million in 1979 to $6.3 million in 1983. Harry Wyborney was being paid a salary of $40,000 annually in 1983. Marie Wyborney was also employed by MCW as a part-time bookkeeper. The company became profitable enough to pay crew bonuses, but by 1983 it was not yet profitable enough for Wyborney to receive a bonus, nor to pay dividends to the shareholders.

On November 14, 1983, Wyborney was summarily fired without prior notice. Although the evidence was conflicting, there was testimony from which the jury could properly find that not only Harry Wyborney but also Marie Wyborney and the entire office staff of MCW were fired when Chance, Malarkey and several others drove up to the asphalt plant, emerged from their vehicles, came into the plant, abruptly fired Harry Wyborney and the office staff and ordered them off the premises (Marie Wyborney was not personally present on the morning of the firing, but another office employee testified that her first notice of her own termination was when a rather white and shaken Mr. Wyborney stepped into the front office and said, "We've all been fired.").

The testimony at trial was conflicting as to why the Wyborneys were fired. Although appellants' legal position is that the Wyborneys' employment was at will, so that they could be fired with or without just cause, they claim that only Harry Wyborney was fired, that the other staff members left voluntarily, and that Wyborney's termination resulted from unresolved complaints over quality control and customer satisfaction (the allegations as to wrongful expenditures arose after the firing, following an internal audit performed by defendant Boers, a CPA).

Wyborney's position is that he was fired because he tried to expand MCW's customer base by soliciting customers in Hawaii who would need a new source of asphalt products when Chevron closed down its operations in Hawaii. One of Chevron's customers in Hawaii, American Factors, was also a customer of Malarkey Roofing Company — Malarkey's Portland company. Wyborney claimed that Malarkey was concerned about competition for the Hawaii business opportunity between MCW and Malarkey's Oregon operations. Several weeks before he was fired, Wyborney was called to a meeting in Portland at which Malarkey proposed a "mutual advantages concept" whereby MCW and Malarkey Roofing could cooperate, allegedly to the mutual benefit of both companies. Wyborney refused to go along with the concept on the basis that the proposals would be detrimental to MCW, although beneficial to Malarkey Roofing in Portland.

The tortious interference with contract claim was based on the Wyborneys' theory that Malarkey and Chance (and others whom the jury did not find liable) acted in concert to intentionally interfere with Wyborney's contract relationship with MCW, Inc., or his business expectancy with respect to MCW, Inc., by causing MCW to fire Wyborney.

DISCUSSION

I

MOTIONS FOR DIRECTED VERDICT AND JUDGMENT N.O.V.

(WRONGFUL DISCHARGE CLAIM)

Prior to submission of the case to the jury, appellant Malarkey Asphalt Company moved for a directed verdict in its favor on the Wyborneys' counterclaim for wrongful termination of employment, arguing that there was no evidence to support a finding that Marie Wyborney had been discharged and that the evidence was insufficient to support a finding that Harry Wyborney was wrongfully discharged. Following trial, these same issues were raised by way of a motion for judgment n.o.v.

While it is true that Marie Wyborney was not present on the morning of November 14, 1983, as already mentioned, there was testimony at the trial that not only

Harry Wyborney but also all of his office staff were indeed discharged. That Malarkey Asphalt denied firing anyone but Harry himself raised a factual issue which the jury may have resolved in the Wyborneys' favor. (The special verdict form did not allow the jury to distinguish between the firing of Marie and the firing of Harry.)

There was testimony at the trial that Harry Wyborney became reemployed after 3 to 4 months. His salary as of the date of discharge was $40,000 annually, *i.e.*, $3,333.33 per month. On the special verdict form at the place where the jury was required to set damages for the wrongful discharge (after responding that Harry and Marie were entitled to recover for wrongful discharge) the jury wrote: "$10,000 (representing 3 months severance pay)." Thus it is clear that while the jury may have found that Marie was wrongfully discharged from her part-time position, the only damages awarded clearly were based on Harry's salary alone.

■ The question of whether the evidence supports a finding that Harry Wyborney was wrongfully discharged is considerably more complex. The Washington Supreme Court stated the applicable law succinctly in *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 233, 685 P.2d 1081 (1984):

> To summarize: An employment contract indefinite as to duration, is terminable at will by either the employee or employer. But such a contract is terminable by the employer only for cause if (1) there is an expressed or implied agreement to that effect or (2) the employee gives consideration in addition to the contemplated service. *Roberts* [*v. ARCO*, 88 Wn.2d 887, 568 P.2d 764 (1977)], at 894. Moreover, promises of specific treatment in specific situations found in an employee manual or handbook issued by an employer to his or her employees may, in appropriate situations, obligate the employer to act in accord with those promises. Lastly, an employer can be liable in tort if he or she discharges an employee for a reason that contravenes a clear mandate of public policy.

There is no employee handbook involved in the present case, but the parties have argued that each of the other three exceptions do or do not apply.

Wyborney argues that he had an express or implied agreement that he would be terminated only for just cause and that he also gave consideration in addition to the contemplated service.[1]

## A. Express or Implied Contract Exception

■ There was no written agreement concerning Wyborney's employment. Nor was there sufficient evidence to establish an express oral agreement that Wyborney's employment would be permanent and that he would not be terminated except for cause. There was no testimony of an express oral agreement that Wyborney's employment would be temporary, however, or that he could be terminated at will. While Wyborney testified that there was in fact an "oral agreement" that his job would be permanent so long as he ran the company properly and the business made money, and that he would not have invested in the enterprise if he were not going to be the permanent plant manager, there was no testimony that these matters were discussed directly among the principals. Viewing all of the evidence most favorably to Wyborney, as must be done on appellants' pre- and post-

---

[1]Although Wyborney argued at trial that he was discharged for a reason that contravenes a clear mandate of public policy, *i.e.,* by reason of an alleged antitrust conspiracy, the trial judge specifically found there was no evidence to support a finding of violation of public policy and declined to instruct the jury on that theory. Wyborney took no exception to that ruling and has not argued antitrust conspiracy as a theory in this appeal, except in support of his request for attorney fees on appeal, and there without citation of authority. To the extent that Wyborney's argument may be that he was fired in "bad faith", that is for properly having declined to breach his fiduciary responsibility of loyalty to MCW, Inc., when faced with Malarkey's "mutual advantages concept", and that such a bad faith reason in and of itself contravenes public policy, we are constrained to disagree. The Supreme Court of this state in *Thompson v. St. Regis Paper Co., supra* at 227 specifically declined to adopt a "bad faith" exception to the terminable at will doctrine, and further, at page 232, limited the public policy exception to public policy which had been clearly stated either legislatively or judicially. Further *"courts should proceed cautiously if called upon to declare public policy . . .."* For all of these reasons we need not rule with respect to whether the discharge may be subject to the "contravention of a clear mandate of public policy" exception, even though appellants have expended considerable energy in arguing this issue.

trial motions, we do find sufficient circumstantial evidence from which a trier of fact could find an *implied* contract that Wyborney's job would be permanent, conditioned upon the financial success of the business, of course, and conditioned upon his properly running the business. There is no dispute that Wyborney's expertise was the motivating factor that caused Chance and Malarkey to desire his participation, in that Malarkey did not wish to personally run the business and Chance desired to continue to serve as a salesman. If all that Wyborney had wanted was a job as plant manager for so long as that suited the wishes of Malarkey and Chance, there would have been little motivation for him to become a shareholder. If all that Malarkey and Chance had wanted was an at-will plant manager, it is unlikely that they would have allowed Wyborney to purchase a one-sixth interest for $9900 when Chance paid $50,000 for his one-sixth interest. As was stated by our Washington Supreme Court in *Roberts v. ARCO*, 88 Wn.2d 887, 894, 568 P.2d 764 (1977):

> Looking first at whether appellant had an implied employment agreement that was not terminable at Arco's will, we note the rule that such an agreement cannot be established solely by an employee's subjective understanding or expectations as to his employment. *Lasser v. Grunbaum Bros. Furn. Co.*, 46 Wn.2d 408, 413, 281 P.2d 832 (1955). Even an assurance of "steady" employment is not sufficient. *Gensman v. West Coast Power Co.*, 3 Wn.2d 404, 101 P.2d 316 (1940). The courts will look at the alleged "understanding", the intent of the parties, *business custom and usage*, the nature of the employment, *the situation of the parties, and the circumstances of the case* to ascertain the terms of the claimed agreement. *Perry v. Sindermann*, 408 U.S. 593, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972).

(Italics ours.)

The jury was entitled to consider whether business custom and usage is such that these three principals, given their respective situations, would have made the deal they did without an implied agreement that Wyborney was more than an at-will employee of MCW, Inc.

### B. Employee Gives Consideration in Addition to the Contemplated Service Exception

The evidence is also supportive of Wyborney's argument that his employment was not terminable, except for cause, because he gave consideration for his employment in addition to the contemplated service. Here the question becomes whether Wyborney "purchased a job" or whether, as argued by appellants, he merely purchased a one-sixth interest in MCW, Inc.

 ██ It is undisputed that Wyborney invested $9,900 into MCW, loaned the company $31,758, divested himself of the Sea-Tac Supply partnership interest (a condition required by the Santis family if Chance and Wyborney were to be allowed to participate with Malarkey in the purchase of the Duwamish Manufacturing facility), in addition to contributing his expertise to MCW for a period of some 5 years before he was summarily terminated. As was stated by the Washington Supreme Court in *Roberts v. ARCO, supra* at 895, consideration sufficient to prevent termination of the employment at the employer's will must be in addition to the required service and must result in a detriment to the employee and a benefit to the employer. *See also,* Annot., *Validity and Duration of Contract Purporting To Be for Permanent Employment,* 60 A.L.R.3d 226 (1974) (comment discussing contract for permanent employment and citing authorities holding consideration sufficient when employee bought into the business, or relinquished prior business interest coupled with benefit to employer, or loaned money to employer at favorable interest rate).

While we have found no Washington cases directly on point, and none have been cited by the parties to this appeal, we hold that the evidence at trial was sufficient to support a jury verdict based on a finding that Mr. Wyborney "purchased a job" rather than merely purchased a minority interest in this closely held corporation. Common sense may well dictate that he did both. The concepts are not mutually exclusive.

This is not necessarily to say that any purchaser of a minority interest in a closely held company who is also

employed there has automatically "purchased a job", for purposes of this exception. Rather, the relevant inquiry is whether, in the circumstances of the particular case, the employee's decision to buy into the company, or to loan money to the company, or to divest himself of a prior business interest, or any combination of these factors, is the type of decision which would ordinarily be made in the absence of something more than an offer of at-will employment. *Carnig v. Carr*, 167 Mass. 544, 46 N.E. 117 (1897); 60 A.L.R.3d 226, 266 (1974). Further, the consideration must be an integral part of the *employment* agreement, so as to negate the general proposition of law that "employment for life" is the equivalent of indefinite employment, terminable at the will of either party. *Chatelier v. Robertson*, 118 So. 2d 241 (Fla. Dist. Ct. App. 1960); 60 A.L.R.3d 226, 290 (1974).

We are satisfied that the evidence in this case would support a jury verdict of wrongful discharge based on the "additional consideration" exception. A rational jury could find that Mr. Wyborney, as he testified, would not have accepted the employment, or purchased a minority interest, or loaned the money, or divested himself of the prior business interest, or contributed his expertise even in exchange for stock, in the absence of an offer or an implied offer for something more than at-will employment. So also, a rational jury could find that the consideration was not only in exchange for a minority shareholder position, but also was an integral part of the employment agreement. It is undisputed that Malarkey didn't need Wyborney's money, nor Chance's money for that matter. What Malarkey and Chance wanted was Wyborney's *expertise*, something they could not get unless he agreed to divest himself of the Sea-Tac Supply interest as demanded by Santis, and something they could not get unless Wyborney could become a part owner *and* be employed as the plant manager. Wyborney so testified. The jury was entitled to believe him and to disbelieve Malarkey and Chance.

The trial court correctly denied the motion for directed verdict and the motion for judgment n.o.v. with respect to the claim of wrongful discharge.

## II
### INSTRUCTION AS TO IMPLIED COVENANT OF GOOD FAITH
### (WRONGFUL DISCHARGE CLAIM)

■ Appellants argue that the trial court erred by giving instruction 36, stating that an implied covenant of good faith and fair dealing exists in every contract, without also mentioning, in that same instruction, that an employer's right to terminate an at-will employee is unrestricted by any such covenant. Appellants rely upon the Supreme Court's rejection of the "bad faith" exception to the terminable at will rule in *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 227-28, 685 P.2d 1081 (1984). Appellants also rely on *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 40 Wn. App. 630, 700 P.2d 338 (1985). Contrary to appellants' arguments, however, neither case stands for the proposition that there is no implied covenant of good faith with respect to at-will employment contracts. To the contrary, the *Barrett* court expressly recognized the obligation of good faith in the performance "of the express terms in employment contracts", although recognizing that the covenant does not limit an employer's discretion in terminating an at-will employee. *Barrett*, at 635 n.6.

The parties to an at-will employment contract have the same obligation to cooperate with each other, so that each may obtain the full benefit of performance, *Lonsdale v. Chesterfield*, 99 Wn.2d 353, 357, 662 P.2d 385 (1983), as do the parties to every other kind of contract in Washington. The implied covenant does not turn an at-will employment contract into one which is subject to the "bad-faith" exception which was rejected in *St. Regis*. The implied covenant does not "rewrite the contract", so as to turn it into a termination for cause contract of employment. Instruction 36 is a correct statement of Washington law, as far as it goes. Here, the jury was also correctly instructed, in instruction 31, that an at-will employment

contract may be terminated at any time, with or without cause. In instruction 37 the trial court specifically instructed the jury that it must find against Wyborney if it found that the contract was at will (that is of indefinite duration) unless it also found either (1) an express or implied agreement requiring cause for termination; or (2) that consideration was given in addition to the contemplated service.

We must review the instructions as a whole. *Caruso v. Local Union 690 of Int'l Bhd. of Teamsters*, 107 Wn.2d 524, 533, 730 P.2d 1299, *cert. denied*, 484 U.S. 815, 98 L. Ed. 2d 31, 108 S. Ct. 67 (1987). When the instructions read as an entirety properly convey the law applicable to the case and are not misleading, they are sufficient. *Price v. Department of Labor & Indus.*, 101 Wn.2d 520, 682 P.2d 307 (1984). Taken together, instructions 31, 36 and 37 do properly convey the applicable law and are not misleading. The question for this jury was whether this was in fact an at-will employment contract. It is inherent in the verdict of the jury that it found this was *not* an at-will contract. We will not infer that in reaching this verdict the jury applied the rejected "bad faith" exception. No rational jury could have done so, in light of instruction 31, and also instruction 37, which followed immediately after the challenged instruction 36.

### III
MOTION FOR JUDGMENT NOTWITHSTANDING VERDICT
(TORTIOUS INTERFERENCE WITH CONTRACT CLAIM)

Appellants do not contend that there was insufficient evidence to support the jury's finding of tortious interference. Rather, they argue that the jury's determination that the Wyborneys' damages were "an amount of money equivalent to all defendants' court costs, legal fees [and] attorney fees" must be overturned because the expenses of litigation are not recoverable unless authorized by contractual obligation, statute or recognized ground of equity. *Lincor Contractors, Ltd. v. Hyskell*, 39 Wn. App. 317, 324, 692 P.2d 903 (1984), *review denied*, 103 Wn.2d 1036 (1985). The court has no authority to

award attorney fees to the prevailing party "absent a contractual provision, statutory provision, or a well recognized principle of equity" which would authorize such an award. *Herzog Aluminum, Inc. v. General Am. Window Corp.*, 39 Wn. App. 188, 191, 692 P.2d 867 (1984). Appellants argue that because the jury attempted to award attorney fees and costs as consequential damages, the judgment on that verdict cannot stand.

The Wyborneys respond first that the appellants did not quarrel with the form of the verdict before the jury was discharged, and that since they allowed the jury to be discharged without challenging the verdict, appellants have waived any dispute with the verdict, citing *Gjerde v. Fritzsche*, 55 Wn. App. 387, 777 P.2d 1072 (1989), *review denied*, 113 Wn.2d 1038 (1990). Alternatively, the Wyborneys try to fit themselves into a statutory ground, RCW 49.48.030, by characterizing their tortious interference claim as an action for wages. Failing that, the Wyborneys argue that they fit into a "recognized equitable ground" because Chance and Malarkey behaved oppressively and in bad faith.

We are quickly able to dispose of the Wyborneys' statutory and equitable "grounds". This was not a claim for wages. This was an action for tort damages. Nor is a claim for tortious interference with contractual rights based on one of those "well recognized principles of equity" which would justify such an award.[2]

---

[2] In *PUD 1 v. Kottsick*, 86 Wn.2d 388, 390, 545 P.2d 1 (1976) the Supreme Court stated that "[a] court may grant attorney fees to the prevailing party if the losing party's conduct constitutes bad faith or wantonness" (citing *State ex rel. Macri v. Bremerton*, 8 Wn.2d 93, 113, 111 P.2d 612 (1941)). The *Macri* opinion indicates that "in certain circumstances fraud or malice may furnish a basis for the recovery of the expenses of litigation, including counsel fees, as an element of damages . . .", *Macri*, at 113 (citing 14 Am. Jur. 38). That same Am. Jur. reference is now found at 20 Am. Jur. 2d *Costs* § 72 (1965). Footnote 3 at that section refers the reader to other sections relating to wrongful attachment, garnishment and execution. We have found no authority, nor have the Wyborneys provided any authority, which would lead us to conclude that in Washington the "bad faith" which may be inherent in a tortious interference with contract case is in and of itself sufficient to provide a basis for an award of attorney fees as damages by reason of "recognized equitable grounds".

In deciding this issue we have first considered the trial court's basis for denying appellants' motion for judgment n.o.v., which was that the jury obviously wanted to make the Wyborneys "whole." The trial court then proceeded to inquire into the amount of the Wyborneys' legal fees and costs and upon determining that they were in the amount of $52,725.23 and that the amount was reasonable, entered judgment for the Wyborneys for $52,725.23 (and also for $10,000 for the wrongful discharge claim). We agree with the trial court that the likely intent of the jury was to make the Wyborneys whole, and appellants have so conceded. Under Washington law, the trial court is charged with interpreting a verdict returned by a jury so as to ascertain and implement the jury's intent. *Wright v. Safeway Stores, Inc.*, 7 Wn.2d 341, 109 P.2d 542, 135 A.L.R. 1367 (1941). The problem here, however, is that the jury's intent is inconsistent with clearly established legal principles.

We have next considered the Wyborneys' waiver argument. That argument is not supported directly by *Gjerde*, in that that case involved a different situation altogether (answers to jury interrogatories which were inconsistent with each other, appellant recognized the inconsistency but remained silent; held that silence in the face of actual knowledge of the inconsistency at a time it could be cured waives the issue on appeal). But nevertheless, there is wisdom in the general rule that parties must raise a point of error at the time the error occurs, so that the trial court has opportunity to correct the error. The purpose of the rule is that such correction will prevent the necessity of an appeal or a new trial. *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983). Here, if we assume the trial court would have recognized the verdict as legally erroneous, an objection would have allowed the court to so advise the jury and to send the jury back for further deliberations.

■ ■ After considerable reflection, we conclude that the judgment on the verdict in the tortious interference matter cannot stand. This is apparently a question of first

impression in Washington, and while we recognize the logic behind the trial judge's approach, we are unable to affirm on the basis that the court was authorized to interpret and implement the jury's clear intent. That which the trial court is not authorized to do does not become valid simply because it was done by the jury instead. After considerable reflection, we also conclude that the appellants' failure to raise the objection before the jury was discharged will not be deemed a waiver. There is no indication in that portion of the record submitted with this appeal that appellants deliberately remained silent in order to "try [their] luck with a second jury." *Gjerde v. Fritzsche, supra* at 394. An issue upon which this court has deliberated at length, and which the trial judge upheld on a tenable theory in ruling on the motion for judgment n.o.v.,[3] should not be subject to the waiver rule, in a case of first impression.

Having determined that the $52,725.23 judgment on the verdict cannot stand, we next consider the appropriate remedy. Appellants argue that since the jury found no damages on the tortious interference claim in excess of the Wyborneys' attorney fees and costs, the obvious answer is simply to reverse the $52,725.23 judgment and be done with the case. The Wyborneys argue that the remedy must be a new trial on the issue of damages.

■ Again, we have found no Washington cases directly on point, but we have found persuasive authority from other jurisdictions:

> The proper remedy for a defective verdict depends on the kind of defect present. Where a verdict is defective because it contains mere surplusage the court may remedy the problem by deleting the surplusage from the final judgment. *Robertson & Wilson Scale & Supply Co v Richman*, 212 Mich 334; 180 NW 470 (1920), *Rawson v McElvaine*, 49 Mich 194; 13 NW 513 (1882). Even if the defect is not due to the presence of surplusage, the court may still alter the verdict itself so long as the court can ascertain the intent of the jury and the

---

[3]While the trial court's theory was tenable, this was not a discretionary ruling. A motion for judgment notwithstanding verdict involves no element of discretion and is granted or denied as a matter of law. *Sepich v. Department of Labor & Indus.*, 75 Wn.2d 312, 450 P.2d 940 (1969).

court's final judgment implements that intent. *Naccarato v Grob*, 384 Mich 248; 180 NW 2d 788 (1970); *Rabior v Kelley*, 194 Mich 107, 116-117; 160 NW 392 (1916). In other situations, however, such as where the verdict is inconsistent, *Harrington v Velat*, 395 Mich 359; 235 NW 2d 357 (1975), *Farm Bureau Mutual Ins Co v Sears, Roebuck & Co*, 99 Mich App 763; 298 NW2d 634 (1980), or contains a remedy not authorized by law, *McCormick v Hawkins*, 169 Mich 641; 135 NW 1066 (1912), *Rathbone v Detroit United Railway*, 187 Mich 586; 154 NW 143 (1915), the trial court must either reinstruct the jury or order a new trial.

*Association Research & Dev. Corp. v. CNA Fin. Corp.*, 123 Mich. App. 162, 167-68, 333 N.W.2d 206, 209 (1983). In that case the Michigan court found that the trial court had erred in ruling that a written notation awarding attorney fees as part of an award was mere surplusage where it was beyond the power of the jury to award attorney fees and costs. The court stated at pages 168-69:

> The trial court apparently believed that the award of attorney fees was surplusage and could be disregarded in entering the judgment. If the jury intended the award to compensate plaintiff only for its legal costs, the award would indeed be surplusage. However, the jury may have intended that the award ensure that plaintiff would have received the full amount of its compensatory damages, undiminished by legal costs. It is reasonable to suppose that, if the jury had been informed that it could not award attorney fees, it would have increased plaintiff's compensatory damages. For this reason, we do not believe the award of attorney fees and costs was surplusage. Nor do we find that the jury's intent was ascertainable. It is equally reasonable to assume that the jury, correctly informed, would have stuck to its original damage award in the conviction that that was all plaintiff deserved. The trial court, therefore, did not have the authority to delete the attorney fees and costs in the final judgment as either surplusage or consistent with the jury's ascertainable intent. The correct response was either to reinstruct the jury or order a new trial. The only available appellate remedy is to reverse the judgment and order a new trial.

The Michigan court appears to have determined that it was the responsibility of the trial court to have sua sponte ordered a new trial or reinstructed the jury since the defendants in that case had also not challenged the form of the verdict.

Similarly, in the case of *Parrish Bakeries of Ga., Inc. v. Wiseman Baking Co.*, 104 Ga. App. 573, 122 S.E.2d 260 (1961), the court indicated that the trial court's actions when faced with an improper verdict are limited to returning the case to the jury with proper instructions or to order a new trial. In the Georgia case the trial court had modified the improper elements of a verdict so as to change the verdict from one for plaintiffs to one for defendants. In the present case the trial court modified an award of attorney fees, which the jury was not authorized to return, to a general award of compensatory damages by reading into the verdict an intent to make the respondents "whole".

We agree with the Wyborneys that the appropriate remedy is reversal of the $52,725.23 judgment and remand for a new trial, on the issue of damages only, with respect to the tortious interference claim. We are unable to ascertain from the record that the jury, had it known it could not measure compensatory damages by the amount of the Wyborneys' legal fees and costs, would have awarded no compensatory damages whatsoever. The jury verdict that Chance and Malarkey are liable on the tortious interference claim has not been challenged and is therefore a verity on appeal and at the new trial.[4] It remains for a new jury to ascertain what if any compensatory damages may be appropriate for the tortious interfer-

---

[4]No issue has been raised in this appeal as to privilege, and while we have been aware of the potential for such defense, *see, e.g., Calbom v. Knudtzon*, 65 Wn.2d 157, 369 P.2d 148 (1964); *Hein v. Chrysler Corp.*, 45 Wn.2d 586, 277 P.2d 708 (1954); Restatement (Second) of Torts §§ 766-773 (1979), the issue is foreclosed from consideration by the law of the case doctrine. *Peters v. Dulien Steel Prods., Inc.*, 39 Wn.2d 889, 892, 239 P.2d 1055 (1952). No issue has been raised in this appeal as to the potential for a relationship between Wyborney's damages for the wrongful discharge and the possible damages for the tortious interference. For purposes of the new trial, the parties may wish to refer to Restatement (Second) of Torts §§ 774A, 912 (1979). Without deciding whether such a relationship exists in this case, we recognize the potential issue of a reduction in damages for the tortious interference to the extent the corporate respondent satisfies the $10,000 judgment for wrongful discharge. This issue was not raised at the first trial.

ence. In view of this ruling, we need not reach appellants' argument regarding the trial court's computation of fees.

■■ The Wyborneys have requested to be awarded their attorney fees for this appeal, pursuant to RAP 18.1, arguing that this is a case involving the compensation of an employee and conspiracy in violation of public policy. The Wyborneys were successful in recovering a judgment for $10,000 as "front pay" from Malarkey Asphalt Company and we have affirmed that award in this appeal. RCW 49.48.030 provides that reasonable attorney fees, in an amount to be determined by the court, shall be assessed against a former employer in any action in which a person is successful in recovering judgment for wages or salary owed. In *Hayes v. Trulock,* 51 Wn. App. 795, 755 P.2d 830, *review denied,* 111 Wn.2d 1015 (1988), a panel of this court construed the statutory phrase "wages or salary owed" to include front and back pay awards in a claim for wrongful discharge. We agree that the Wyborneys are entitled to recover from Malarkey Asphalt Company that portion of their reasonable attorney fees for this appeal which is attributable to the wrongful discharge claim. The request for fees as against Malarkey and Chance individually is denied, however. RCW 49.48.030 provides for an award of fees only in an action against an "employer or former employer". By its terms the statute does not apply to an action against third parties such as the individual appellants in this case. In complying with RAP 18.9, the Wyborneys shall segregate the time dedicated to the legal theories for which fees are allowed. *See Travis v. Washington Horse Breeders Ass'n,* 111 Wn.2d 396, 410-11, 759 P.2d 418 (1988).

The $10,000 judgment for wrongful discharge is affirmed. The case is remanded for vacating of the

$52,725.23 judgment for tortious interference and for a new trial on damages for tortious interference.

WEBSTER, A.C.J., and SCHOLFIELD, J., concur.

After modification, further reconsideration denied December 18, 1991.

Review by Supreme Court pending May 1, 1992.