[No. 29766-7-III.   Division Three.   February 16, 2012.]

EVERGREEN MONEYSOURCE MORTGAGE COMPANY, *Appellant*, v.
LARRY SHANNON ET AL., *Respondents*.

*Lindsey Truscott* and *Jordan M. Hecker*, for appellant.

*David E. Sonn* (of *Jeffers Danielson Sonn & Aylward PS*); *Michelle A. Green*; and *Leslie R. Weatherhead* and *Matthew W. Daley* (of *Witherspoon, Kelley, Davenport & Toole*), for respondents.

¶1 KULIK, C.J. — Beginning in 1997, Larry Shannon operated a real estate lending office in Moses Lake, Washington. Over the years, the office served as a branch office for six different residential lenders. From March 2007 through April 2009, the office was affiliated with Evergreen Moneysource Mortgage Company. On April 30, 2009, this relationship ended and, the next day, the entire Moses Lake branch became affiliated with Guild Mortgage. Evergreen filed this action, alleging breach of contract and breach of the duty of loyalty by Mr. Shannon; tortious interference with business expectancy and contractual relations by Mr. Shannon and Guild; and a violation of the Consumer Protection Act (CPA), chapter 19.86 RCW, by Mr. Shannon and Guild. The court dismissed these claims and denied Evergreen's motion for leave to amend to add a claim based on Washington's Uniform Trade Secrets Act (UTSA), chapter 19.108 RCW. We affirm the trial court's dismissal of the breach of contract, tortious interference, and CPA claims. We also affirm the denial of the motion to amend. We conclude that the wrongful disclosure claim was not set forth in the complaint. We reverse the dismissal of the breach of duty of loyalty claim related to employee solicitation.

## FACTS

¶2 In 1997, Larry Shannon opened an office in Moses Lake to obtain loans for homebuyers. From 1997 until 2007, the Moses Lake office was affiliated with six different lenders. On March 28, 2007, Mr. Shannon became employed with Evergreen. As part of his employment with Evergreen, Mr. Shannon signed a branch manager agreement.

¶3 Beginning in November 2008, Evergreen, at times, was unable to fund or timely fund a number of loans that the Moses Lake office was ready to close. This situation continued into the spring of 2009. Mr. Shannon discussed this matter with Evergreen's president, Keith Frachiseur,

on several occasions. On April 10, 2009, Mr. Frachiseur came to the Moses Lake office and spoke to all of the employees. He made promises concerning how Evergreen would fund loans in the future. He also promised a retention bonus for each employee who remained with Evergreen.

¶4 Evergreen and the Moses Lake branch concluded their relationship on April 30, 2009. Mr. Shannon and the Moses Lake branch affiliated with Guild, effective May 1.

¶5 Charles Nay, regional vice president for Guild, was responsible for recruitment. In February 2009, he approached Mr. Shannon about moving Mr. Shannon's mortgage origination branch to Guild.

¶6 Before Guild extended an offer to the Moses Lake branch, Mr. Shannon gave Mr. Nay (1) Evergreen's profit and loss statement, (2) Evergreen's rate list, and (3) Evergreen's loan originator agreement. Evergreen alleges that this information was confidential and that Guild was on notice of Evergreen's claims of ownership and confidentiality or, alternatively, Evergreen's claim of a trade secret.

¶7 Mr. Nay stated he was unaware that any of this information belonged to Evergreen or that it was confidential. Mr. Nay believed that Mr. Shannon was providing his own internal branch information and that Mr. Shannon had a right to do so. Mr. Nay stated that Guild did not look at the price sheet because Guild's loan pricing is set by market forces and with reference to Guild's internal cost structure. Evergreen's rate list would not apply to Guild.

¶8 Mr. Shannon points out that during the time his office was affiliated with Evergreen, the information contained in the rate sheet was not confidential and could be located on the Internet. Mr. Nay asked Mr. Shannon to provide the loan officers' compensation plan so that he could compare it to Guild's standard terms to see if Guild's standard terms would accommodate the Moses Lake branch's desire to become affiliated with Guild. Mr. Nay maintains that he did not use the sample loan officer

agreement to sculpt or otherwise determine the terms of the compensation agreement offered by Guild.

¶9 The final piece of information provided by Mr. Shannon to Mr. Nay was the profit and loss statement. Guild maintains that Evergreen offers no evidence showing that the profit and loss statement was confidential or that Mr. Nay was aware of Evergreen's claim of confidentiality.

¶10 Evergreen maintains that Mr. Nay used Evergreen's profit and loss information to prepare two pro forma reports. These reports show that the Moses Lake branch would make approximately $3.1 to $3.33 million in the first month with Guild. Mr. Frachiseur states that he reviewed the two pro formas created for the Moses Lake branch and the projections for the first month's gross income—$3.1 to $3.33 million—could not be accomplished unless Evergreen's existing customer base or loans were moved to Guild.

¶11 Guild denies using the profit and loss information provided by Mr. Shannon for any purpose. Guild believed that Mr. Shannon had the right to share the information. Guild agrees that it created a pro forma analysis showing projections as to how Mr. Shannon's branch would perform if affiliated with Guild. Guild contends that Evergreen failed to present evidence showing that the profit and loss information was confidential or that Guild was aware the information was confidential.

¶12 Mr. Shannon and the Moses Lake branch terminated their affiliation with Evergreen, and the branch became affiliated with Guild on May 1, 2009. Evergreen contends Mr. Shannon agreed that up until this date, all customers coming in the door would belong to Evergreen. In Evergreen's view, Mr. Shannon and his office also agreed to close as many loans as possible in Evergreen's pipeline before May 1. After that date, Evergreen personnel would close any remaining unclosed loans.

¶13 Evergreen contends that despite these promises, Mr. Shannon worked to divert loans from Evergreen to Guild

prior to May 1. Specifically, Evergreen asserts that after Mr. Shannon and the Moses Lake branch became affiliated with Guild, Mr. Shannon moved 17 Evergreen customers to Guild.

¶14 Evergreen filed suit against Mr. Shannon and Guild. Evergreen's complaint was based on three sets of allegations: (1) that in March 2009, Mr. Shannon began originating loans for Guild; (2) that Mr. Shannon originated fictitious loans;[1] and (3) that Mr. Shannon solicited Evergreen employees to work for Guild. Based on these allegations, Evergreen alleged five causes of action: breach of contract, breach of duty of loyalty, tortious interference with business expectancy, tortious interference with contractual relations, and violation of the CPA.

¶15 Evergreen filed a motion for partial summary judgment. As part of this motion, Evergreen asserted that Mr. Shannon breached his contract with Evergreen by disclosing Evergreen's profit and loss sheet, rate sheet, and loan originator agreement.

¶16 On November 15, 2010, Mr. Shannon filed a motion for summary judgment. Guild joined in this motion. On November 17, six months after the deadline to amend pleadings, Evergreen sought leave to amend its complaint. In its motion, Evergreen sought to include a claim based on the UTSA. On January 10, 2011, the court denied the motion to amend. On February 8, the court granted summary judgment in favor of Mr. Shannon and Guild, dismissing all of Evergreen's claims. Mr. Shannon was awarded his attorney fees and costs based on the branch manager agreement between Mr. Shannon and Evergreen.

¶17 Evergreen appeals, alleging the court erred by dismissing the breach of contract claim and the breach of duty of loyalty claim made against Mr. Shannon, and the CPA claims and tortious inference claims against Mr. Shannon

---

[1] This claim was dismissed by the trial court and is not mentioned in Evergreen's briefs.

and Guild. Evergreen also seeks the reversal of the award of $97,755.33 in attorney fees awarded to Mr. Shannon. Mr. Shannon and Evergreen seek attorney fees on appeal. Evergreen also challenges the court's decision to deny the motion for leave to amend.

## ANALYSIS

¶18 Summary judgment is proper when the pleadings and the evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). Once the moving party has made and supported his or her motion, the nonmoving party must come forward with specific facts showing that a genuine issue of fact exists for trial. CR 56(e). When reviewing a summary judgment, the appellate court must consider the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

¶19 If the moving party is the defendant who meets his or her showing, the inquiry shifts to the plaintiff. At that point, the plaintiff must make a showing sufficient to establish the existence of each element essential to that plaintiff's case in order to defeat summary judgment. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

¶20 Throughout its briefs, Evergreen repeatedly argues that its complaint impliedly states a wrongful disclosure claim against Mr. Shannon and Guild. According to Evergreen, Guild and Mr. Shannon used Evergreen's confidential information to lure the entire Moses Lake branch over to Guild. Evergreen uses this same argument to support its request to amend its complaint in order to add a UTSA claim.

I. Breach of Contract Claim and Breach of Duty of Loyalty Claim against Mr. Shannon

■ ■ ¶21 *Improper Solicitation of Evergreen's Employees*. Paragraph 7 of the branch manager agreement reads, in part:

> *After Agent leaves Evergreen's employment*, Agent shall not, on his/her own behalf or on behalf of any third party, directly or indirectly, solicit or aid anyone in the solicitation of any employees of Evergreen.

Clerk's Papers (CP) at 555 (emphasis added). Evergreen contends the court erred by dismissing its breach of contract and breach of duty of loyalty claims against Mr. Shannon. Evergreen asserts that Mr. Shannon violated the branch manager agreement with Evergreen and his duty of loyalty to Evergreen by (1) improperly soliciting Evergreen's employees, (2) improperly soliciting Evergreen's customers, and (3) improperly disclosing Evergreen's confidential and proprietary information to Guild.

¶22 During the period of employment, an employee has a duty to refrain from soliciting customers for a rival business or to act in direct competition with his or her employer's business. *Kieburtz & Assocs. v. Rehn*, 68 Wn. App. 260, 265, 842 P.2d 985 (1992) (quoting Restatement (Second) of Agency § 393 cmt. e (1958)).

¶23 Mr. Shannon contacted Guild in February 2009. Evergreen and the Moses Lake branch concluded their relationship on April 30, 2009. The Moses Lake branch affiliated with Guild effective May 1. Any solicitation of employees by Mr. Shannon occurred before the Moses Lake branch employees left their at-will employment with Evergreen. Hence, Evergreen presents no evidence that Mr. Shannon breached paragraph 7 of the contract.

¶24 But there is a question as to whether Mr. Shannon breached his duty of loyalty to Evergreen by soliciting employees during the last few months he worked for Ever-

green. Mr. Shannon contends there is no evidence to support Evergreen's employee solicitation claim.

¶25 However, Rita Nicholas testified that Mr. Shannon wanted her to move with him to Guild and that the move was discussed in terms of the whole group of employees going to Guild. Significantly, Ms. Nicholas testified that she had no independent contact with Guild other than through Mr. Shannon. Ms. Nicholas stated:

Q. So, in other words, at some point in time it became clear that like the medical benefits available at Guild were a little more expensive than the medical benefits at Evergreen; is that fair to say?

A. Yes.

. . . .

Q. At some point in time, did somebody tell you there would be additional compensation from Guild to make up the difference in benefits?

A. Yes.

Q. And who told you that?

A. Larry.

CP at 546. At his deposition, Mr. Nay testified that the objective was to bring over the whole package—all of the employees.

¶26 Based on this testimony, there is a question of material fact as to whether Mr. Shannon breached his duty of loyalty by soliciting Evergreen's employees before he left Evergreen's employment.

¶27 Mr. Shannon argues that Evergreen's solicitation claim was properly dismissed because Evergreen failed to provide evidence as to damages. When asked to list any and all damage Evergreen sustained because of Mr. Shannon's alleged solicitation of Moses Lake employees, Evergreen's representative testified that there was none. However, Mr. Frachiseur, while not providing a dollar amount, did provide information concerning the lost loans, commission

expense, and bonuses, which could be used when calculating damages.

¶28 The court erred by dismissing Evergreen's breach of loyalty employee solicitation claim against Mr. Shannon.

■ ¶29 *Improper Solicitation of Evergreen's Customers*. Paragraph 6 of the agreement provides, in part:

> Non-independently developed contacts, clients or customers shall remain the property of Evergreen. Upon termination of this Agreement, Agent shall deliver and surrender all documents and loan information to Evergreen. Agent acknowledges and agrees that the business opportunities and relationships reflected in all documents are Evergreen's sole and exclusive property. Once processing on any customer or borrower's application has commenced by Evergreen, Agent shall not remove any file or any documents from such file.

CP at 554.

¶30 Evergreen asserts that at least 17 of Evergreen's customers ended up closing loans with Guild rather than Evergreen. Mr. Shannon refers to these loans as the "lost loans." Evergreen bases this conclusion on the pipeline reports prepared for each company. In Evergreen's view, once a borrower's name appeared on Evergreen's pipeline report, the individual was then considered to be an Evergreen customer.

¶31 While Evergreen bases its lost loans claim on the matching names found in Evergreen's and Guild's pipeline reports, Guild looks at the matter differently. Guild refers to a document it prepared that summarizes various declarations and other evidence. Guild's document establishes the date a person becomes a customer by using the date of the relevant purchase and sales agreement. Guild argues that Evergreen cannot show that it would have closed any of the lost loans.

¶32 Specifically, the document prepared by Guild shows:

| | |
|---|---|
| Loans released by Evergreen to Guild | 3 |
| Loans failing to meet Evergreen's standards | 2 |
| Loans not closed by Evergreen or Guild | 2 |
| Loan applications started after 4/30/09 | 5 |
| Purchase and sale agreements signed & loan applications started after 4/30/09 | 5 |
| TOTAL | 17 |

*See* CP at 961-63.

¶33 In her declaration, Anne Fisher explains that she was the loan originator on 9 of the 17 loans. She states that on each of the loans she originated, the individual contacted her after May 1, 2009, and asked her to obtain the loan through Guild.

¶34 Evergreen focuses on three particular loan applications for borrower "G.L,"[2] borrower "D.T.," and borrower "T.C." Each of these borrowers appeared on the pipeline reports for both Evergreen and Guild. However, each of these borrowers told Mr. Shannon that they wanted to stay with his office.

¶35 Evergreen uses these three declarations to support its argument. But these declarations favor Mr. Shannon, not Evergreen.

¶36 Evergreen relies on an e-mail dated April 22, 2009, from Mr. Shannon to Guild. This e-mail reads:

Currently we have about 50 or 60 files that we need to get into the system. We need to close between 25 and 30 of these files in May. We are starting to have issues with borrowers and realtors and need to move forward as soon as we can.

CP at 618.

---

[2] Borrowers are listed in Evergreen's and Guild's pipeline reports with their last name first. This convention is adopted here.

¶37 However, Evergreen makes no effort to explain this e-mail in terms of the numbers appearing on the pipeline reports.

¶38 Here, Guild presented evidence demonstrating why borrowers named in Evergreen's pipeline report elected to finish their loans with Guild. Evergreen makes no effort to counter this evidence.

¶39 The court did not err by granting summary judgment in favor of Mr. Shannon and Guild with regard to the lost loans claim.

¶40 *Improper Disclosure of Confidential and Proprietary Information.* Evergreen contends that a claim for improper disclosure of confidential and proprietary information was pleaded in the complaint. Alternatively, Evergreen argues that an improper disclosure claim is *implicit* in the complaint and that the court erred by dismissing it. Evergreen contends that this claim is different from the cause of action for violation of the UTSA that Evergreen sought to add in its motion for leave to amend.

¶41 Evergreen asserts that the improper disclosure claim in its complaint is based on paragraph 6 of the agreement. Paragraph 6 provides that Mr. Shannon cannot disclose Evergreen's proprietary information.

¶42 Evergreen maintains that Mr. Shannon violated the agreement by disclosing Evergreen's confidential and proprietary information to Guild. Specifically, Evergreen contends that Mr. Shannon breached his obligation to Evergreen by disclosing Evergreen's (1) profit and loss sheet, (2) rate list, and (3) loan originator agreement.

¶43 CR 8 provides:

A pleading which sets forth a claim for relief . . . shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief and (2) a demand for judgment for the relief to which he deems himself entitled.

■ ■ ¶44 "[P]leadings are primarily intended to give notice to the court and the opponent of the general nature of

the claim asserted." *Lightner v. Balow*, 59 Wn.2d 856, 858, 370 P.2d 982 (1962). A complaint must state the nature of a plaintiff's claims and the legal theories upon which the claims rest. *Molloy v. City of Bellevue*, 71 Wn. App. 382, 385, 859 P.2d 613 (1993). "[P]leadings are to be liberally construed; their purpose is to facilitate proper decision on the merits, not to erect formal and burdensome impediments to the litigation process." *State v. Adams*, 107 Wn.2d 611, 620, 732 P.2d 149 (1987) (citing *Caruso v. Local Union No. 690 of Int'l Bhd. of Teamsters*, 100 Wn.2d 343, 349, 670 P.2d 240 (1983)).

¶45 "[I]nitial pleadings which may be unclear may be clarified during the course of summary judgment proceedings." *Id.* However, while inexpert pleading is permitted, insufficient pleading is not. *Dewey v. Tacoma Sch. Dist. No. 10*, 95 Wn. App. 18, 23, 974 P.2d 847 (1999). " 'A pleading is insufficient when it does not give the opposing party fair notice of what the claim is and the ground upon which it rests.' " *Id.* (quoting *Lewis v. Bell*, 45 Wn. App. 192, 197, 724 P.2d 425 (1986)). "A party who does not plead a cause of action or theory of recovery cannot finesse the issue by later inserting the theory into trial briefs and contending it was in the case all along." *Id.* at 26.

¶46 Evergreen contends that a claim for improper disclosure of confidential and proprietary information was pleaded in the complaint as part of its claim for the improper closing of Evergreen's customer's loans. Evergreen points to the following language in the complaint:

> [T]he Agreement provided that all contracts, clients or customers developed during [Mr.] Shannon's employment with Evergreen belonged to Evergreen.
>
> . . . .
>
> 3.2 Pursuant to the Agreement, [Mr.] Shannon promised, amongst other things, to use his best and exclusive efforts to originate loans for Evergreen, acknowledged that all clients and files for loans originated during his employment belonged to Evergreen, and agreed not to solicit Evergreen employees and input false information into Evergreen's files.

3.3 [Mr.] Shannon failed to honor his obligations under the Agreement.

CP at 5, 7.

¶47 In its prayer for relief, Evergreen asks "[f]or an Order that [Mr.] Shannon and Guild return all client files to Evergreen, which were originated during [Mr.] Shannon's employment." CP at 10-11.

¶48 This language is insufficient to put Mr. Shannon on notice that Evergreen intended to plead a claim for improper disclosure of confidential and proprietary information. Evergreen failed to give Mr. Shannon fair notice of the disclosure claim or the grounds upon which it rested.

¶49 Evergreen next contends that the improper disclosure claim was pleaded through discovery. In *Adams*, the court concluded that "initial pleadings which may be unclear may be clarified during the course of summary judgment proceedings." *Adams*, 107 Wn.2d at 620. Here, the complaint is not unclear; a wrongful disclosure claim is simply not made.

¶50 Evergreen supports its argument by relying on documents and deposition testimony. The references to pages in the depositions of Mr. Shannon and Mr. Nay do not contain questions or answers that clearly indicate that Evergreen was pursuing an improper disclosure claim.

¶51 Given that the complaint does not contain even an unclear reference to an improper disclosure claim, later statements by Mr. Frachiseur did not clarify the complaint. Evergreen did not plead a claim of improper disclosure of confidential and proprietary information in its complaint.

¶52 The court erred by dismissing the breach of duty of loyalty claim against Mr. Shannon relating to the employee solicitation. The court did not err by dismissing the breach of contract claims or by refusing to consider the improper disclosure of confidential and proprietary information claim.

II. Tortious Interference

¶53 A defendant is liable for tortious interference with a contractual or business expectancy when (1) there exists a valid contractual relationship or business expectancy, (2) the defendant had knowledge of the same, (3) the defendant's intentional interference induced or caused a breach or termination of the relationship or expectancy, (4) the defendant's interference was for an improper purpose or by improper means, and (5) the plaintiff suffered damage as a result. *Pleas v. City of Seattle*, 112 Wn.2d 794, 800-05, 774 P.2d 1158 (1989).

¶54 *Tortious Interference with Employees*. Evergreen first argues that Mr. Shannon and Guild tortiously interfered with its contractual and business expectancies with its employees.

¶55 To prove these claims, Evergreen had to prove that it had a valid expectancy in the continued employment of the Moses Lake branch employees. *See Woody v. Stapp*, 146 Wn. App. 16, 24, 189 P.3d 807 (2008). The employees of the Moses Lake branch were at-will employees. Importantly, "at-will employees do not have a business expectancy in continued employment." *Id.*

¶56 Evergreen relies on *Calbom v. Knudtzon*, 65 Wn.2d 157, 396 P.2d 148 (1964). In *Calbom*, the trial court made a finding concerning the existence of an attorney-client relationship, whereby the plaintiff attorney was engaged to undertake the long-term probate of an estate. *Id.* at 163. The defendants argued that the attorney was engaged to perform services only for the limited purpose of admitting the will to probate and securing an order authorizing continuation of the business. *Id.* Examining the evidence as a whole, the appellate court concluded that even though the attorney-client relationship was terminable at will, the evidence and reasonable inferences supported the trial court's finding of an existing attorney-client privilege that

the attorney had every right to anticipate would continue. *Id.* at 164.

¶57 Here, Evergreen has provided no circumstances showing an employer-employee relationship with Moses Lake employees that was anything other than an at-will relationship.

¶58 *Tortious Interference with Evergreen's Customers.* Evergreen next argues that Mr. Shannon and Guild tortiously interfered with Evergreen's business expectation that its customers would close their loans with Evergreen. Evergreen asserts that Guild interfered with Evergreen's expectation by assisting Mr. Shannon in diverting Evergreen's customers' loans to Guild. The evidence Evergreen offered to support these claims is the list of 17 borrowers' names that appeared on both Evergreen's pipeline reports and Guild's pipeline reports.

¶59 In response to this list of names, Mr. Shannon and Guild offered a summary detailing the evidence for each loan. This summary shows that none of the borrowers were taken from Evergreen. As noted earlier, in response to this evidence, Evergreen had to come forward with evidence showing it had an expectancy interest in at least one of the loans. It did not. Evergreen failed to raise a question of material fact as to the interference with business expectancy and contractual relations claims. Evergreen also asserts that examining the *projected* income on Guild pro forma reports for the first month, it is obvious that Guild was planning the transfer of Evergreen's customers' loans to Guild. This argument is not persuasive.

¶60 Evergreen has failed to put forward sufficient facts to raise a question of material fact with respect to its claim of tortious interference based on the solicitation of the lost borrowers. The court did not err by dismissing the tortious inference claim against Mr. Shannon and Guild.

III. CONSUMER PROTECTION ACT

¶61 Under Washington's CPA, a defendant violates the CPA when its (1) unfair or deceptive act (2) occurred in

commerce, (3) affected the public interest, and (4) proximately caused (5) damage to the plaintiff's business or property. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986). Evergreen does not allege any per se violation of the CPA. To establish a claim under the CPA, Evergreen must demonstrate that the alleged misconduct impacted public interest.

¶62 "The [first] two elements may be established by a showing that (1) an act or practice which has a capacity to deceive a substantial portion of the public (2) has occurred in the conduct of any trade or commerce." *Id.* at 785-86. Under the first element, the plaintiff must prove either that a per se unfair trade practice exists, or that the act in question " 'had the capacity to deceive a substantial portion of the public.' " *Brown v. Brown*, 157 Wn. App. 803, 816, 239 P.3d 602 (2010) (quoting *Hangman Ridge*, 105 Wn.2d at 785).

¶63 Evergreen also does not allege a per se unfair trade practice. Additionally, Evergreen failed to allege any specific deception or deceptive acts. In short, Evergreen failed to create a question of material fact as to whether the conduct alleged would have the capacity to deceive anyone, much less a substantial portion of the public.

¶64 The purpose section of the CPA, RCW 19.86-.920, demonstrates "a clear intent to protect the general public by means of the CPA as a whole." *Hangman Ridge*, 105 Wn.2d at 788. The public interest element of the *Hangman Ridge* test may be established in one of two different ways. *Id.* at 789. Specifically, (1) through a per se claim or (2) by the plaintiff satisfying a factor derived from the *Hangman Ridge* case. *Id.* at 789-90. Evergreen has not pleaded or asserted a per se claim; consequently, Evergreen had to offer evidence to satisfy a *Hangman Ridge* factor.

¶65 "[I]t is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that

affects the public interest." *Id.* at 790. Significantly, conduct that is not directed at the public but, rather, at a competitor, lacks the capacity to impact the public in general. *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 744, 935 P.2d 628 (1997) (public interest not affected despite tire dealers' tactics to secure dealership expansions).

¶66 Because this is a private dispute, the facts that determine whether there is an impact on public interest are (i) whether the acts were committed in the course of defendant's business; (ii) whether the defendant actively advertised to the public in general; (iii) whether the defendant actively solicited this particular plaintiff, indicating potential solicitation of others; and (iv) whether the plaintiff and defendant occupy unequal bargaining positions. *Hangman Ridge*, 105 Wn.2d at 790-91.

¶67 Here, Evergreen cannot show that Guild's and Mr. Shannon's conduct was directed at the public. Evergreen contends that Guild's use of Evergreen's confidential and proprietary information constituted anticompetitive actions that affected the public. But this claim is not before the court because it was not pleaded in the complaint.

¶68 Taking the facts in the light most favorable to Evergreen, Evergreen has failed to meet the public interest element of the *Hangman Ridge* test.

¶69 The court did not err by dismissing Evergreen's claims against Guild and Mr. Shannon based on a violation of the CPA.

IV.  MOTION TO AMEND

¶70 Evergreen contends the trial court abused its discretion by denying Evergreen's motion for leave to amend its complaint. Evergreen seeks to amend its complaint to add a claim based on the UTSA.

¶71 On July 15, 2009, Evergreen filed its complaint. This complaint asserted five causes of action: breach of contract, breach of a duty of loyalty, tortious interference with a

business relationship, tortious interference with contractual relations, and violation of the CPA. These claims were based on allegations that (1) in March 2009, Mr. Shannon began originating loans for Guild; (2) Mr. Shannon apparently "originated fictitious loans for Evergreen"; and (3) Mr. Shannon also "solicited Evergreen employees to work for Guild." CP at 6.

¶72 On February 5, 2010, Guild supplied Evergreen with the three documents that serve as the basis for its motion for leave to amend. These documents are (1) an Evergreen profit and loss statement, (2) an Evergreen loan originator agreement, and (3) an Evergreen rate list. *See* Resp't Larry Shannon's Br. at 27.

¶73 In its scheduling order, the trial court established May 18, 2010, as the last day to amend pleadings. The cutoff date for discovery was October 20. When Evergreen brought its motion for leave to amend on November 17, the case had not been set for trial. On January 10, 2011, the trial court denied Evergreen's motion for leave to amend. On February 8, the court granted summary judgment, dismissing all claims against Mr. Shannon and Guild.

¶74 When amendment of a complaint must be accomplished by leave of the court, leave to amend shall "be freely given when justice so requires." CR 15(a). The amendment of pleadings is within the discretion of the trial court and its ruling will not be reversed absent an abuse of discretion. *Walla v. Johnson*, 50 Wn. App. 879, 882, 751 P.2d 334 (1988). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

¶75 "Although undue delay is a legitimate ground for denying leave to amend the pleadings, such delay must be accompanied by prejudice to the nonmoving party." *Walla*, 50 Wn. App. at 883. "The touchstone for denial of an amendment is the prejudice such amendment would cause." *Caruso*, 100 Wn.2d at 350.

¶76 Mr. Shannon and Guild argue that they were prejudiced by Evergreen's undue delay in filing its motion for leave to amend. Mr. Shannon and Guild assert that the amendment will require the parties to complete additional discovery and to repeat already conducted discovery. For example, according to them, discovery must be undertaken to investigate the basis for Evergreen's claim that the three items qualify as trade secrets and to determine whether there was misappropriation, improper means, independent economic value, and whether efforts were undertaken to maintain the documents' secrecy. The trial court heard the arguments of counsel and reviewed the pleadings and the documents listed in exhibit A of the order denying the motion to amend. These documents included schedules, orders, numerous declarations, and memoranda. It is doubtful that these documents and files constitute trade secrets.

¶77 We conclude that the trial court did not abuse its discretion by denying the motion to amend.

### V. ATTORNEY FEES

¶78 Mr. Shannon was awarded attorney fees of $97,755.33 by the trial court. An award of attorney fees is allowed if authorized by law. RAP 18.1. A contractual provision that allows for attorney fees and costs is authority to grant such fees and costs on appeal to the prevailing party. *Farm Credit Bank of Spokane v. Tucker*, 62 Wn. App. 196, 207, 813 P.2d 619 (1991). The branch manager agreement contains a fee provision that entitles the prevailing party to its reasonable attorney fees and costs.

¶79 Mr. Shannon seeks an award of fees on appeal. Pursuant to RAP 18.1(i), we refer the award of attorney fees on appeal to the trial court following remand.

### VI. CONCLUSION

¶80 We affirm the dismissal of the breach of contract claim. We affirm the court's dismissal of CPA claims. We affirm the dismissal of the motion to amend. We affirm the

dismissal of the tortious interference claims. We conclude that the wrongful disclosure claim was not set forth in the complaint. We reverse the dismissal of the breach of duty of loyalty claim related to employee solicitation. We remand to the trial court for trial and determination of attorney fees at trial and on appeal.

KORSMO and SIDDOWAY, JJ., concur.

Reconsideration denied May 3, 2012.