IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| NORIO MITSUOKA, | ) | No. 72123-2-I |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FUMOTO ENGINEERING OF | ) | ORDER DENYING MOTION |
| AMERICA, INC., a Washington | ) | FOR RECONSIDERATION, |
| Corporation; NAOYUKI YAMAMOTO, | ) | WITHDRAWING & REPLACING |
| FUMIKO GIKEN CO., LTD, a | ) | OPINION |
| Japanese corporation, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

Appellant filed a motion for reconsideration of the court's June 22, 2015 opinion. Respondent filed an answer. The court has considered the motion and the answer and determined that reconsideration should be denied, but that the opinion should be withdrawn and a replacement opinion filed.

The opinion has been changed by replacing the sentence on page 12 that currently reads:

"Because this theory has not been adequately pleaded, the tort claims also fail under CR 12(b)(6)."

with the following:

"Because this theory that he was terminated only for just cause has not been adequately pleaded, the tort claims also fail under CR 12(b)(6).

Additionally, the sentence immediately following, "As discussed above, the complaint fails to allege facts establishing that Mitsuoka had an employment contract for just

No. 72123-2-I/2

cause termination, and an at-will employee has no valid business expectancy in continued employment," has been deleted.

Now, therefore, it is hereby

ORDERED that the opinion filed June 22, 2015 is withdrawn and replaced by an opinion which includes the above noted changes. It is further

ORDERED that appellant's motion for reconsideration is denied. It is further

Dated this 24ᵗʰ day of August, 2015.

_____

_____

_____
Spearman, C.J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| NORIO MITSUOKA, | ) | No. 72123-2-I |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FUMOTO ENGINEERING OF | ) | |
| AMERICA, INC., a Washington | ) | |
| corporation; NAOYUKI YAMAMOTO, | ) | |
| FUMOTO GIKEN CO., LTD, a | ) | UNPUBLISHED OPINION |
| Japanese corporation, | ) | |
| | ) | FILED: August 24, 2015 |
| Respondents. | ) | |
| | ) | |

VERELLEN, J. — After being fired as president of Fumoto Engineering of America (FEA), a company created to be the exclusive dealer of oil valves supplied by Fumoto Giken Company (FGC), Norio Mitsuoka sued FEA, FGC, and the owner of FGC, alleging wrongful termination and tortious interference with a business expectancy. He appeals the trial court's dismissal of his complaint on a CR 12(b)(b) motion. Because the complaint fails to allege sufficient facts establishing that Mitsuoka had a contract for employment terminable only for just cause, the trial court properly dismissed the complaint for failure to state a claim for wrongful termination or tortious interference. Accordingly, we affirm.

FACTS

Based on allegations in the second amended complaint, in 1983, Naoyuki Yamamoto approached Norio Mitsuoka about starting a company in the United States that would serve as an exclusive distributor of oil changer valves produced by Yamamoto's company, Fumoto Giken Co., Ltd. (FGC). Yamamoto is a Japanese citizen and resident of Japan, and FGC marketed and sold its valves in Japan. Mitsuoka is also a Japanese citizen, but has been living in the United States since 1981.

In 1984, TATM Corporation, doing business as Fumoto Engineering of America, Inc. (FEA) was incorporated in California. FEA entered into a written agreement with FGC that FEA would be the exclusive distributor of FGC's valves so long as FEA wished to sell the product. Mitsuoka was a 50 percent shareholder of FEA.[1] Mitsuoka agreed to serve as president of FEA in exchange for permanent employment as president so long as FEA was successful. Mitsuoka had sole responsibility for the operations and management of FEA.

In 1991, Mitsuoka moved to Washington state, and FEA was reincorporated as a Washington corporation. After reincorporation in Washington, Mitsuoka remained president of FEA with a 12.5 percent share ownership. The remaining shares were owned by FGC at 62.5 percent and Hamai Industries (Hamai) at 25 percent. Hamai manufactured the valves in Japan and was FGC's sole supplier.

---

[1] It appears that Yamamoto and FGC were not initial shareholders. See Clerk's Papers (CP) at 586 ("FGC and Hamai Industries would later join Plaintiff as shareholders for FEA.").

For the next several years, Mitsuoka continued to serve as president of FEA and its sole employee and had sole responsibility for the operations and management of FEA. FGC was FEA's sole supplier, and FEA was the exclusive representative of FGC's products in the United States and elsewhere, except in Japan. During this time, FEA increased its gross revenue from $500,000 in 1991 to approximately $3,000,000 by April of 2012.

In 2005, Yamamoto's son attended school in New York and began selling the FGC valves from a website he created for his company, Quik Valve. Yamamoto requested that his son's new company be permitted to use the name "Fumoto New York." Mitsuoka objected, having concerns about market confusion and violation of the exclusive distributor agreement with FEA. At the direction of Yamamoto, FGC sold valves directly to the son's business in New York, undercutting FEA's sales and giving the son's business a competitive advantage.

In 2010, one of FEA's distributors suggested Mitsuoka develop a different source of valve supply to avoid currency fluctuation problems with purchasing valves from Japan. Mitsuoka presented this idea to Yamamoto, and Yamamoto asked Mitsuoka to investigate this possibility. Mitsuoka did so, informed Yamamoto of his progress, and in 2012, sent Yamamoto sample alternative valves.

In December 2012, Yamamoto held a meeting in Japan with his son, a representative of Hamai, and a man named Rick Harder, who operated a company in California that was a subsidiary of Hamai. Mitsuoka received no notice of the meeting and did not attend. After the meeting, Yamamoto sent Mitsuoka an e-mail with a letter attached dated August 20, 2010, stating that Yamamoto was opposed to the idea of

3

FEA investigating manufacturers other than Hamai. This was the first time Mitsuoka had seen the letter, but he stopped all activity relating to alternative sources of the valves.

On or about March 21, 2013, Harder met with Mitsuoka and told Mitsuoka that he was being fired from his position as president and employee of FEA. He identified no cause for the termination, but stated that he was acting on instructions from Yamamoto and Hamai. Mitsuoka then received a notice of a shareholders' meeting of FEA scheduled for April 4, 2013. On April 2, 2013, Yamamoto sent Mitsuoka a letter stating that his termination was due to his unauthorized investigation of an alternate source of valves for FEA to sell, which led to the manufacture of an alternatively sourced valve. At the April 4, 2013 shareholder meeting, Mitsuoka was terminated as president, director, and employee of FEA. Harder was elected president of FEA, and Yamamoto's son was elected as a director of FEA.

In June 2013, Mitsuoka filed a complaint against FEA, Yamamoto, and FGC (collectively defendants), alleging shareholder oppression, breach of fiduciary duties, and wrongful termination of employment. In October 2013, Mitsuoka filed an amended complaint omitting the shareholder oppression claim and adding a claim for interference with contractual relations. He then filed a second amended complaint adding a claim for tortious interference with a business opportunity.

The defendants moved to dismiss the complaint for failure to state a claim under CR 12(b)(6), and the trial court granted the motion. Mitsuoka moved for reconsideration and leave to amend the complaint, submitting a proposed third amended complaint with additional factual allegations and adding back in a claim for minority shareholder

oppression. The trial court denied the motion for reconsideration and declined to consider the motion for leave to amend, finding that the third amended complaint was not properly before the court. Mitsuoka appeals.

## DISCUSSION

### I. Wrongful Termination Claim

Mitsuoka contends that the trial court erred by dismissing his claim for wrongful termination because the complaint alleged facts showing that he had a contract guaranteeing him just cause termination and because the reason given for his firing was a pretext for an improper purpose. We disagree. Even under the deferential CR 12(b)(6) standard, Mitsuoka fails to adequately state a claim for relief.

We review a CR 12(b)(6) dismissal de novo.[2] "'Dismissal is warranted only if the court concludes, beyond a reasonable doubt, the plaintiff cannot prove any set of facts which would justify recovery.'"[3] The court assumes the truth of all facts alleged in the complaint and may consider hypothetical facts supporting the plaintiff's claim.[4] But if a plaintiff's claim remains legally insufficient even under hypothetical facts, dismissal pursuant to CR 12(b)(6) is appropriate.[5]

We review the second amended complaint, which was before the court on the CR 12(b)(6) motion. Mitsuoka contends the complaint pleads a claim for wrongful

---

[2] FutureSelect Portfolio Management, Inc. v. Tremont Group Holdings, Inc., 180 Wn.2d 954, 962, 331 P.3d 29 (2014).

[3] Id. (internal quotation marks omitted) (quoting Tenore v. AT&T Wireless Servs., 136 Wn.2d 322, 329-30, 962 P.2d 104 (1998)).

[4] Id.

[5] Id. at 963.

termination based on a contract guaranteeing him just cause termination. He argues the complaint alleges three theories in support of this claim: that Mitsuoka had an express employment contract for just cause termination, that he had an implied contract for such employment, and that he gave additional consideration to imply such a contract.

"Generally, an employment contract, indefinite as to duration, is terminable at will by either the employee or employer."[6] An employment contract is terminable by the employer only for cause if (1) there is an expressed or implied agreement to that effect or (2) the employee gives consideration in addition to the contemplated service."[7]

### A. Express Contract

To support his express contract theory, Mitsuoka focuses on the allegations in paragraph 11 of the complaint:

> FEA Contract of Permanent Employment: At the time FEA was first incorporated [in] California, at re-incorporation in Washington and thereafter, Plaintiff agreed to serve and continue to serve as President and work for FEA in exchange for employment on a permanent basis as the President of FEA so long as Plaintiff chose and so long as the Company was successful. In addition to the Distribution Agreement and discussions with Yamamoto, evidence of this agreement of permanent employment and Plaintiff's ongoing personal investment in and additional consideration to FEA is the parties' subsequent course of dealing, course of performance and acts or omissions.[8]

But these allegations are limited to an agreement for "permanent employment," with no mention of a contract between FEA and Mitsuoka limiting termination of his employment only for just cause.

---

[6] Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 223, 685 P.2d 1081 (1984).

[7] Id. at 233.

[8] Clerk's Papers (CP) at 587.

An agreement for "permanent" or "steady" employment does not require just cause termination. As the court recognized in Roberts v. ARCO, there must be an additional showing that either the parties intended that termination could only be for cause, or the employee gave additional consideration:

> [A] contract for 'permanent' or 'steady' employment (as opposed to 'temporary' or 'lifetime' employment) is terminable by the employer only for just cause if: (1) there is an implied agreement to that effect, or (2) the employee gives consideration in addition to the contemplated services."[9]

As discussed below, the complaint does not adequately allege facts to establish either an implied agreement or additional consideration. Mitsuoka's allegations of an agreement for "permanent employment" fail to demonstrate any valid express contract theory.

### B. Implied Contract

The complaint also fails to allege sufficient facts to support the theory that Mitsuoka had an implied agreement for employment terminable only for just cause. To determine whether such an implied agreement exists, "courts will look at the alleged 'understanding,' the intent of the parties, business custom and usage, the nature of the employment, the situation of the parties and the circumstances of the case to ascertain the terms of the claimed agreement."[10] But this theory depends on an agreement between the employer and the employee, which is not alleged here.

At every turn, the articulation of Mitsuoka's implied contract theory begins with conversations and alleged understandings between Yamamoto, FGC, and Mitsuoka,

---

[9] 88 Wn.2d 887, 894, 568 P.2d 764 (1977) (emphasis omitted); see also Gensman v. West Coast Power Co., 3 Wn.2d 404, 412, 101 P.2d 316 (1940).

[10] Roberts, 88 Wn.2d at 894.

even before FEA, the employer, came into existence.[11] The implied contract allegations continue with the exclusive distributorship agreement between FGC and FEA, and mentions the reincorporation of FEA. But there are no allegations in the second amended complaint related to an implied agreement between FEA and Mitsuoka. Those other collateral discussions and representations may be consistent with some kind of implied agreement, but even under the generous CR 12(b)(6) standard, they do not constitute an allegation of an implied employment contract between FEA and Mitsuoka. No matter how many alleged conversations between Yamamoto and Mitsuoka or between FEA and FGC there were over the years, those do not imply a contract between FEA and Mitsuoka for employment terminable only for cause. Accordingly, the complaint fails to state a claim for wrongful discharge based on an implied employment contract for just cause termination.

Mitsuoka's reliance on Malarkey Asphalt Co. v. Wyborney is misplaced.[12] There, the court held there was sufficient evidence to establish an implied agreement for employment terminable only for cause. The plaintiff and defendants formed a company to purchase and operate an asphalt facility, and the plaintiff invested $9,900 for a one-sixth interest in the company and loaned the company $31,748. As part of the deal to purchase the facility, the plaintiff was required to give up his interest in another business. Once the company purchased the facility, the plaintiff assumed primary responsibility for running the daily operations of the new company, as he had

---

[11] At oral argument, counsel clarified that FEA was not yet created when the agreement was made.

[12] 62 Wn. App. 495, 814 P.2d 1219 (1991).

experience and expertise in the marketing and production of asphalt. He received a salary as plant manager, but the company was not profitable enough to pay dividends. He was eventually fired and brought a wrongful discharge claim.[13]

The court concluded there was sufficient evidence that the parties intended an agreement for just cause termination:

> There is no dispute that [plaintiff's] expertise was the motivating factor that caused [defendants] to desire his participation, in that [one defendant] did not wish to personally run the business and [the other defendant] desired to continue to serve as a salesman. If all that [plaintiff] had wanted was a job as a plant manager for so long as that suited the wishes of [defendants], there would have been little motivation for him to become a shareholder. If all that [defendants] wanted was an at-will plant manager, it is unlikely that they would have allowed [plaintiff] to purchase a one-six interest for $9900 when [one defendant] paid $50,000 for his one-sixth interest. . . .
>
> The jury was entitled to consider whether business custom and usage is such that these three principals, given their respective situations, would have made the deal they did without an implied agreement that [plaintiff] was more than an at-will employee.[14]

But here, there were no facts alleged about the original investment in FEA by any of the parties, except that Mitsuoka initially had a 50 percent share and that Yamamoto and Hamai "later join[ed] Plaintiff as shareholders."[15] Nor were there other details related to Mitsuoka's agreement to work for FEA evidencing that FEA and Mitsuoka intended a contract for employment terminable only for just cause. The complaint fails to allege that there was an implied employment agreement.

---

[13] Id. at 499-500.

[14] Id. at 504.

[15] CP at 53.

### C. Consideration

Finally, the complaint fails to allege sufficient facts for Mitsuoka's third theory, that he gave consideration beyond the contemplated services to imply an employment agreement for just cause termination. As the court recognized in Malarkey, "the consideration must be an integral part of the employment agreement, so as to negate the general proposition of law that 'employment for life' is the equivalent of indefinite employment, terminable at the will of either party."[16]

In Malarkey, the court held there was sufficient evidence that the plaintiff's employment was terminable only for just cause because he gave the additional consideration of making an initial investment and loan at the time of the company's formation and gave up an interest in another company in order to start the company.[17] The court concluded that the evidence was sufficient to support a finding that the plaintiff "'purchased a job' rather than merely purchased a minority interest in this closely held corporation."[18] But the court was careful to confine its holding, noting that not "any purchaser of a minority interest in a closely held company who is also employed there has automatically 'purchased a job,' for purposes of this exception," and

---

[16] Malarkey, 62 Wn. App. 505-06 (emphasis omitted).

[17] Id.; see also Bakotich v. Swanson, 91 Wn. App. 311, 317-18, 957 P.2d 275 (1998) (reiterating that such consideration must be "an integral part of the employment agreement," and holding that an employee's agreement to invest his pension in the new employer's pension fund was not an integral part of the employment agreement making the employment terminable only for just cause).

[18] Malarkey, 62 Wn. App. at 505.

emphasizing that the consideration must be an integral part of "the *employment* agreement."[19]

The consideration alleged here does not equate with a negotiated integral term of the employment agreement. The complaint alleges that Mitsuoka gave consideration by foregoing a salary in the first six months of the company's existence, personally guaranteeing a $200,000 loan and an $150,000 line of credit for FEA, personally loaning $390,000 to FEA over the course of his employment, unilaterally reducing his salary to offset reduction in revenue and profit in 2008, and working full time at various times without receiving a salary. But these all occurred after Mitsuoka agreed to run the company and were simply part of keeping the business going. As the trial court noted:

> All of these decisions that were made are consistent with actions that would be made by a president of a company who is looking to keep the company afloat because, in his whole discretion, he gets the proceeds from the company. And none of these things necessarily are linked to any pre-employment condition or condition precedent to hiring him as the president.[20]

Thus, the complaint fails to establish that Mitsuoka gave consideration beyond the contemplated services.

The second amended complaint fails to allege a valid legal theory that Mitsuoka was not an at-will employee. The complaint fails to state a claim for wrongful discharge. The trial court properly dismissed the claim.

---

[19] Id. at 505-06.

[20] Report of Proceedings (May 23, 2014) at 60.

## II. Tortious Interference Claims

Mitsuoka also contends that the trial court erred by dismissing the tortious interference claims. We disagree.

The elements of a prima facie case of tortious interference with contractual relationship or business expectancy are

> "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. Ill will, spite, defamation, fraud, force, or coercion, on the part of the interferor, are not essential ingredients, although such may be shown for such bearing as they may have upon the defense of privilege."[21]

The complaint alleges claims for tortious interference with contract and business expectancy based on (1) Mitsuoka's "contractual relationship and business expectancy with FEA for permanent employment,"[22] (2) the distributor agreement between FEA and FGC, and (3) Yamamoto's fiduciary duties as a majority shareholder to FEA and to Mitsuoka, as a shareholder and employee of FEA. The complaint alleges that Yamamoto's misrepresentations to Hamai about Mitsuoka's investigation of alternative valve sources caused FEA to purposefully interfere with Mitsuoka's "implied and express contractual rights with Defendant FEA,"[23] and that Yamamoto's diversion of the distribution and sale of FGC valves to his son's business violated the exclusive distribution agreement with FEA and breached Yamamoto's fiduciary duties to FEA and

---

[21] Pleas v. City of Seattle, 112 Wn.2d 794, 800, 774 P.2d 1158 (1989) (quoting Calbom v. Knudtzon, 65 Wn.2d 157, 162-63, 396 P.2d 148 (1964)).

[22] CP at 595.

[23] Id.

Mitsuoka "as shareholder and as employee."[24] The complaint further alleges that such interference caused FEA to terminate Mitsuoka without just cause.

Mitsuoka's claims of interference with his permanent employment are premised on Mitsuoka not being an at-will employee. Because this theory that he was terminated only for just cause has not been adequately pleaded, the tort claims also fail under CR 12(b)(6). Accordingly, the complaint fails to state a claim for tortious interference based on Mitsuoka's contract or business expectancy for permanent employment, and was properly dismissed.

The complaint also fails to state a claim for tortious interference based on Yamamoto's interference with the distributor agreement with FEA. While the complaint alleges that Yamamoto's diversion of FEA's business to his son interfered with FGC's distributor agreement with FEA, this simply establishes interference with FEA's contract, not a contract with Mitsuoka.

Nor does the complaint state a claim of tortious interference based on a breach of Yamamoto's fiduciary duty to Mitsuoka as a shareholder and employee. The allegations establish that Yamamoto's diversion of business to his son was contrary to FEA's interests and hurt FEA's profitability. But the harm identified in the complaint is Mitsuoka's wrongful termination, which is the result of the alleged improper firing, not Yamamoto's alleged disloyalty to FEA.

Finally, Mitsuoka contends that the complaint stated a claim for minority shareholder oppression. But the second amended complaint did not include that claim,

---

[24] Id. at 596.

and it was therefore not subject to the CR 12(b)(6) motion.[25] Thus, that issue is not properly before this court for review.

### III. Leave to Amend

Mitsuoka challenges the trial court's failure to grant his motion for leave to amend after the court ruled on the CR 12(b)(6) motion and dismissed the complaint. He contends that the amended complaint sought to supply additional facts that the court indicated were "missing" and necessary to state a claim and that not allowing him to present those facts in an amended complaint was an abuse of discretion. We disagree.

The decision to grant leave to amend the pleadings is within the trial court's discretion.[26] "The trial court's decision 'will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'"[27] "The touchstone for the denial of a motion to amend is the prejudice such an amendment would cause to the nonmoving party."[28] "In determining whether prejudice would result, a court can consider potential delay, unfair surprise, or the introduction of remote issues."[29] A court may also consider whether the new claim is futile or untimely.[30]

---

[25] See CP at 70 (track changes version of the proposed third amended complaint indicating addition of a fourth cause of action for oppression of plaintiff as a minority shareholder).

[26] Wilson v. Horsley, 137 Wn.2d 500, 505, 974 P.2d 316 (1999).

[27] Id. (quoting State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

[28] Id.

[29] Karlberg v. Otten, 167 Wn. App. 522, 529, 280 P.3d 1123 (2012).

[30] Ino Ino, Inc. v. City of Bellevue, 132 Wn.2d 103, 142, 937 P.2d 154 (1997).

Mitsuoka fails to show that the trial court abused its discretion by denying him leave to amend. This was his fourth attempt to plead his claims. He makes no showing why he could not have included these additional allegations earlier, or at the very least, in conjunction with his response to the CR 12(b)(6) motion. Instead, Mitsuoka waited until after the court's adverse ruling on the CR 12(b)(6) motion and then crafted yet another complaint that not only adds substantial factual allegations, but includes a claim previously pleaded and deleted. Granting Mitsuoka's request for leave to amend at this juncture in the proceedings—after the defendants have already responded to multiple complaints and obtained a ruling on a motion to dismiss—would result in undue delay, thereby prejudicing the defendants. Mitsuoka fails to establish an abuse of discretion.

We affirm.

WE CONCUR:

Specimen, C.J.

15