# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| GEORGE E. ENGSTROM and<br>JOHN E. STOCKWELL, | ) ) ) | No. 77538-3-I |
| Appellants, | ) ) | DIVISION ONE |
| v. | ) ) | |
| MICROSOFT CORPORATION, | ) ) | UNPUBLISHED OPINION |
| Respondent. | ) ) ) | FILED: May 6, 2019 |

MANN, A.C.J. — George Engstrom and John Stockwell appeal the trial court's summary judgment dismissal of their claim for wrongful discharge in violation of public policy against Microsoft Corporation. They believe that they were terminated from Microsoft as retaliation for initiating an investigation into another Microsoft employee. Because Engstrom and Stockwell failed to meet their burden to plead and prove that a stated public policy, either legislatively or judicially recognized, may have been contravened, dismissal of their claim for wrongful discharge in violation of public policy was appropriate. We affirm.

I.

Engstrom and Stockwell were high level managers within Microsoft's Online Services Division. In late 2010, Engstrom and Stockwell began working with Brandon Yoon, a lower level Microsoft employee. Yoon was tasked with acting as a liaison between LG Uplus—a Korean cell phone carrier—and Microsoft on a deal that Engstrom and Stockwell were supervising.

In early 2011, Stockwell and Engstrom became concerned over Yoon's expense reports. They believed that Yoon may have been taking Microsoft clients to "hostess bars"—establishments that employ women to provide men with companionship, some of which also provide illegal prostitution services—and expensing illegal prostitution masked as benign meal charges. After confronting Yoon about their concerns, which he denied, Stockwell and Engstrom reported Yoon to Microsoft's Human Resources department.

In response, Microsoft's Office of Legal Compliance (OLC) opened an investigation into Yoon's expense reports. Engstrom and Stockwell assert, however, that Microsoft continually stymied the investigation. They allege that Microsoft refused to devote sufficient assets to properly investigate their allegations, and did not have a Korean language translator look at the various receipts that Yoon had submitted for reimbursement. While this investigation was ongoing, Yoon transferred out of Engstrom and Stockwell's work group with the help of Corporate Vice President Harry Shum. Further, Stockwell asserts that Jeff Williams, a Microsoft Human Resources manager, called him at his house and asked him to drop the complaint against Yoon. Ultimately, the OLC concluded that there was no evidence of wrongdoing.

After the investigation was closed, Engstrom and Stockwell assert that the retaliation against them began. Engstrom and Stockwell believe that Yoon was the protégé of Harry Shum, who told his good friends, President of Online Services Division Qi Lu and Corporate Vice President David Ku, to retaliate against Engstrom and Stockwell. For example, Engstrom and Stockwell were transferred to other working groups at Microsoft soon after the investigation closed. Engstrom was almost demoted by Qi Lu but was able to gain temporary protection after e-mailing Microsoft CEO Steve Ballmer. Engstrom was later demoted by David Ku. Similarly, Stockwell believed that he was taken off of a potentially lucrative project only after the manager of the project spoke to Qi Lu about Stockwell. Both Engstrom and Stockwell also believe that they received unwarranted negative performance reviews as retaliation for reporting Yoon.

In May 2013, Corporate Vice President David Ku notified the 80 Microsoft employees involved with two projects—"Triani" and "Slice"—that both projects were cancelled. Engstrom and Stockwell were both members of those projects. Ku told the employees that they should try to find alternative employment arrangements within Microsoft. Those employees continued to get paid by Microsoft while trying to find suitable employment. All but 4 of the 80 affected employees were able to find alternative employment within Microsoft. Neither Engstrom nor Stockwell found alternative employment.

In October 2013, Ku prepared a business justification memorandum for a selective reduction in force for the four employees who had not yet found alternative employment: Engstrom, Stockwell, Yarom Boss, and Jeffrey Robinson. In December 2013, Ku terminated Stockwell and Boss as part of the reduction in force. Robinson

-3-

was not terminated because he was able to find alternative employment at the last minute. Engstrom was not terminated until January 2014 because he was on paternity leave at the time. Ku allowed Engstrom to return from paternity leave and allowed $335,000 worth of Engstrom's stock options to vest before terminating him.

On February 25, 2015, Engstrom and Stockwell sued Microsoft alleging that it had wrongfully discharge them in violation of public policy. In June 2015, the trial court granted Microsoft's motion to dismiss, and Engstrom and Stockwell appealed. In September 2015, while that appeal was pending, Microsoft agreed to a voluntary remand in light of three recently decided Supreme Court cases.[1] See Engstrom v. Microsoft Corp., No. 74200-1-I (Wash. Ct. App. Feb. 16, 2016) (unpublished) (per curiam). For the next two years the parties engaged in extensive discovery. After discovery closed Microsoft moved for summary judgment, which the trial court orally granted on September 25, 2017.

A week later, Engstrom and Stockwell moved for leave to amend their complaint to assert a new source of public policy under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(d). The trial court denied the motion because it found that the Engstrom and Stockwell had unduly delayed bringing the motion, the amendment would be futile, and Microsoft would be unduly prejudiced by the amendment. Engstrom and Stockwell then unsuccessfully moved for reconsideration. Engstrom and Stockwell appeal.

---

[1] Rose v. Anderson Hay and Grain Co., 184 Wn.2d 268, 358 P.3d 1139 (2015); Becker v. Community Health Systems, Inc., 184 Wn.2d 252, 359 P.3d 746 (2015); and Rickman v. Premera Blue Cross, 184 Wn.2d 300, 358 P.3d 1153 (2015).

II.

We review a trial court's grant of summary judgment de novo. Camicia v. Howard S. Wright Constr. Co., 179 Wn.2d 684, 693, 317 P.3d 987 (2014). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). When making this determination, we consider all facts and make all reasonable factual inferences in the light most favorable to the nonmoving party. Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

A.

The Washington Supreme Court first recognized the wrongful discharge in violation of public policy tort in Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 232, 685 P.2d 1081 (1984). There, the court described the tort as a narrow exception to the at will employment doctrine. "[T]o state a cause of action, the employee must plead and prove that a stated public policy, either legislatively or judicially recognized, may have been contravened." Thompson, 102 Wn.2d at 232. "[T]he burden shifts to the employer to prove that the dismissal was for reasons other than those alleged by the employee." Thompson, 102 Wn.2d at 232-33. In Gardner v. Loomis Armored, Inc., the Supreme Court clarified that there are four situations when the tort is recognized:

> (1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing.

128 Wn.2d 931, 936, 913 P.2d 377 (1996).

When the employee's case "does not fit neatly within one of these [four] scenarios . . . a more refined analysis may be necessary, and the four-factor Perritt analysis may provide helpful guidance." Becker v. Community Health Systems, Inc., 184 Wn.2d 252, 259, 359 P.3d 746 (2015) (citing HENRY H. PERRITT, JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES, § 3.7 (1991) (hereinafter Perritt). To meet their burden of proof under the Perritt test, a plaintiff must show: (1) the existence of a clear public policy (the clarity element), (2) that discouraging the conduct in which the plaintiff engaged would jeopardize the public policy (the jeopardy element), (3) that the public-policy-linked conduct caused the dismissal (the causation element), and (4) that the defendant has not offered an overriding justification for the dismissal of the plaintiff (the absence of justification element). Gardner, 128 Wn.2d at 941; Martin v. Gonzaga University, 191 Wn.2d 712, 723, 425 P.3d 837 (2018).

B.

As a preliminary matter, Engstrom and Stockwell assert that the Perritt test does not apply because they are whistleblowers. Microsoft disagrees and argues that Engstrom and Stockwell are not whistleblowers because they only raised concerns about an employee's expense records, they did not complain that their employer, Microsoft, had committed misconduct.

Viewed in the light most favorable to Engstrom and Stockwell, we assume without deciding that they are whistleblowers and thus fit within the scope of Gardner. But regardless of whether Engstrom's and Stockwell's actions constituted whistleblowing, they must still demonstrate that their discharge may have been motivated by actions that contravene a clear expression of public policy. See, e.g.,

Martin, 191 Wn.2d at 724-25 (When the appellant's claim is based on whistle-blowing he still "has the burden to show that his discharge may have been motivated by reasons that contravene a clear mandate of public policy.").[2]

To meet their burden, Engstrom and Stockwell were required to "plead and prove that a stated public policy, either legislatively or judicially recognized, may have been contravened." Thompson, 102 Wn.2d at 232; Martin, 191 Wn.2d at 725. In Thompson, the Supreme Court "embraced a burden-shifting analysis in which the analytical focus was whether the employee could establish that the discharge clearly contravened public policy." Rose, 184 Wn.2d at 275 (citing Thompson, 1102 Wn.2d at 232-33). And while Gardner "refined the tort's analytical framework somewhat [the Supreme Court] expressly refrained from substantively changing the underlying tort requirements." Rose, 184 Wn.2d at 277. "[T]he tort [remains] a narrow exception to the at-will doctrine and must be limited only to instances involving very clear violations of public policy." Rose, 184 Wn.2d at 276.

"'The question of what constitutes a clear mandate of public policy is one of law and can be established by prior judicial decisions or constitutional, statutory, or regulatory provisions or schemes." Martin, 191 Wn.2d at 725 (quoting Dicomes v. State, 113 Wn.2d 612, 617, 782 P.2d 1002 (1989)). "A court may not sua sponte manufacture public policy but rather must rely on that public policy previously manifested in the constitution, a statute, or a prior court decision." Rickman v. Premera Blue Cross, 184 Wn.2d 300, 310, 358 P.3d 1153 (2015).

---

[2] Counsel for Engstrom and Stockwell agreed at oral argument.

Engstrom and Stockwell rely on the Foreign Corrupt Practices Act of 1977, 15 U.S.C. § 78m (FCPA), to demonstrate that there is a clearly established public policy against falsifying corporate records or books. The FCPA makes it illegal for corporations to bribe foreign officials. 15 U.S.C. § 78dd-1(a)(1) ("It shall be unlawful for any [publically traded corporation to] . . . pay[], promise to pay, or authoriz[e] . . . payment of any money . . . [to] any foreign official for purposes of . . . influencing any act or decision . . . or inducing such foreign official to use his influence" to favor the corporation). The FCPA also contains a books and records provision, which requires corporations to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A).

Engstrom and Stockwell assert that the books and records provision of the FCPA established a second public policy beyond just prohibiting the bribery of foreign officials. But contrary to their argument, our Supreme Court has previously stated that "the [FCPA] is a clear expression of public policy that bribery of foreign officials is contrary to the public interest and that specific companies . . . must institute accounting practices to ensure that this public policy is advanced." Thompson, 102 Wn.2d at 234.[3] See also S. REP. NO. 95-114, at 3, 7 ("Taken together, the accounting requirements and [bribery] prohibitions of [the FCPA] should effectively deter corporate bribery of foreign government officials. . . . The accounting standards . . . are intended to operate in

---

[3] See also Sedlacek v. Hillis, 145 Wn.2d 379, 386, 36 P.3d 1014 (2001) (the FCPA is "a clear expression of public policy in favor of careful accounting to prevent bribery of foreign officials."); Danny v. Laidlaw Trans. Servs. Inc., 165 Wn.2d 200, 219-20, 193 P.3d 128 (2008) (the FCPA's public policy is to "prohibit[] bribery of foreign officials.").

tandem with the [antibribery provisions] . . . to deter corporate bribery."), reprinted in 1977 U.S.C.C.A.N. 4098, 4100, 4104.

Engstrom and Stockwell further argue that because the FCPA makes it illegal to falsify corporate books or records, the Supreme Court's language in Thompson, that courts should "inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme[,]" indicates that the clear public policy element is met here. 102 Wn.2d at 232. But, contrary to the appellants' assertion, this language was intended to indicate that the asserted public policy must be clear. The quote continues: "courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject." Thompson, 102 Wn.2d at 232 (citing Parnar v. Americana Hotels, Inc., 65 Hawaii 370, 652 P.2d 625 (1982)).

Engstrom and Stockwell do not allege anything related to the bribery of foreign officials. Rather, they allege that they were discharged for internally reporting a subordinate's expense reports. Because the FCPA's public policy was not implicated here, Engstrom and Stockwell failed to meet their initial burden to demonstrate a prima facie case for wrongful discharge in violation of public policy.

III.

Lastly, Engstrom and Stockwell contend that the trial court abused its discretion in denying their motion to amend their complaint to include a second public policy under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, et seq. We disagree.

This court reviews a trial court's denial of a motion to amend a complaint for an abuse of discretion. Shelton v. Azar Inc., 90 Wn. App. 923, 928, 954 P.2d 352 (1998).

The burden of proving an abuse of discretion has occurred "rests upon the challenging party." Duckworth v. City of Bonney Lake, 91 Wn.2d 19, 34, 586 P.2d 860 (1978).

"[A] party may amend the party's pleadings only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." CR 15(a). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." Tagliani v. Colwell, 10 Wn. App. 227, 233, 517 P.2d 207 (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)). But it is within the trial court's discretion to deny a motion to amend if there was an undue delay in bringing the motion, if it would result in undue prejudice to the opposing party, or if the amendment would be futile. Tagliani, 10 Wn. App. at 233 (quoting Foman, 371 U.S. at 182).

The trial court did not abuse its discretion in denying Engstrom and Stockwell's motion to amend. First, Engstrom and Stockwell unduly delayed in bringing their motion. The motion for leave to amend was filed over two years after the initial complaint and a week after the trial court orally granted Microsoft's motion for summary judgment. The basis for the requested motion was to reference the "public policy of honesty in corporate financial reporting" recognized in Becker v. Community Health Systems, Inc, 184 Wn.2d 252, 359 P.3d 746 (2015), and to allege a second public policy under the whistleblower protection provisions of the Sarbanes-Oxley Act.

Although Becker was decided after Engstrom and Stockwell filed their initial action, Becker was one of the trio of cases that resulted in the voluntary remand of the initial appeal. See Engstrom v. Microsoft Corp., No. 74200-1-I (Wash. Ct. App. Feb. 16, 2016) (unpublished) (per curiam). Had Engstrom and Stockwell wished to amend their

complaint to include the desired references in Becker, they had the perfect opportunity to do so after the initial remand and before beginning discovery. But to neglect that motion until after discovery had been completed and the trial court orally granted the respondent's motion for summary judgment was an undue delay.

Second, the motion to amend was futile. Shelton v. Azar, Inc., 90 Wn. App 923, 928, 954 P.2d 352 (1998) (trial court abused discretion in granting leave to amend where the amendment was futile). The proposed amendment would have been futile because the policies behind the whistleblower protections of the Sarbanes-Oxley Act do not apply here. Section 1514A of Sarbanes-Oxley provides protection to employees of publically traded corporations if they provided information to or otherwise assisted in an investigation. 18 U.S.C. § 1514A(a). Under Sarbanes-Oxley, a plaintiff must establish that he or she engaged in protected activity and the activity must relate to securities fraud. Sarbanes-Oxley is intended to protect employees who report "'fraudulent activity that can damage innocent investors'" and "'to provide federal protection to private corporate whistleblowers.'" Day v. Staples, Inc., 555 F.3d 42, 52 (1st Cir. 2009) (quoting S. Rep. No. 107-146, at 19 (2002); Carnero v. Boston Sci. Corp., 433 F.3d 1, 11 (1st Cir. 2006)). A single employee's misuse of expense reports, even if a violation of company policy, does not rise to the level of securities fraud that Sarbanes-Oxley was intended to address.

Similarly, in Becker, the plaintiff was the defendant's Chief Financial Officer and he claimed he refused to publicly misrepresent the company's operating losses in public filings and that he was constructively discharged for his insubordination. Becker, 184 Wn.2d at 255-56. This is different from Engstrom and Stockwell, whose expense

concerns involved internal expense reports by a subordinate, not Microsoft's public financial reports.

Finally, the trial court did not abuse its discretion in denying the motion to amend due to the prejudice it would cause Microsoft. Engstrom and Stockwell had the requisite knowledge and opportunity to amend their complaint shortly after its initial filing. Granting this motion would have essentially forced the parties to reopen discovery and dispositive motions, more than two years into the litigation. See Evergreen Moneysource Mortgage Co. v. Shannon, 167 Wn. App. 242, 262-63, 274 P.3d 375 (2012) (no abuse of discretion to deny motion to amend where nonmoving parties would be required to complete additional discovery and repeat already conducted discovery).

The trial court did not abuse its discretion in denying Engstrom and Stockwell's motion for leave to amend.

Because Engstrom and Stockwell failed to meet their burden to plead and prove that a stated public policy, either legislatively or judicially recognized, may have been contravened, dismissal of their claim for wrongful discharge in violation of public policy was appropriate.

We affirm.

_Mann, ACJ_

WE CONCUR:

_Andrus, J._

_Verellen, J._

-12-